## TAHOE-SIERRA PRESERVATION COUNCIL, INC., ET AL. *v.* TAHOE REGIONAL PLANNING AGENCY ET AL.

No. 00–1167.   Argued January 7, 2002—Decided April 23, 2002

304

*Michael M. Berger* argued the cause for petitioners. With him on the briefs were *Gideon Kanner* and *Lawrence L. Hoffman.*

*John G. Roberts, Jr.,* argued the cause for respondents. With him on the brief were *Frankie Sue Del Papa,* Attorney General of Nevada, and *William J. Frey,* Deputy Attorney General, *Bill Lockyer,* Attorney General of California, *Richard M. Frank,* Chief Assistant Attorney General, *Matthew Rodriquez,* Senior Assistant Attorney General, and *Daniel L. Siegel,* Supervising Deputy Attorney General, *E. Clement Shute, Jr., Fran M. Layton, Ellison Folk, John L. Marshall,* and *Richard J. Lazarus.*

*Solicitor General Olson* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Assistant Attorney General Cruden, Deputy Solicitor General Kneedler,* and *Malcolm L. Stewart.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Small Property Owners et al. by *Martin S. Kaufman;* for the American Farm Bureau Federation et al. by *John J. Rademacher* and *Nancy McDonough;* for the Institute for Justice by *William H. Mellor, Clint Bolick, Scott Bullock,* and *Richard A. Epstein;* for the National Association of Home Builders by *Christopher G. Senior* and *David Crump;* for the Pacific Legal Foundation et al. by *R. S. Radford, June Babiracki Barlow,* and *Sonia M. Younglove;* and for the Washington Legal Foundation by *Daniel J. Popeo, Richard A. Samp,* and *Douglas B. Levene.*

Briefs of *amici curiae* urging affirmance were filed for the State of Vermont et al. by *William H. Sorrell,* Attorney General of Vermont, and *Bridget Asay,* Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Bruce M. Botelho* of Alaska, *Janet Napolitano* of Arizona, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Earl I. Anzai* of Hawaii, *Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland,

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether a moratorium on development imposed during the process of devising a comprehensive land-use plan constitutes a *per se* taking of property requiring compensation under the Takings Clause of the United States Constitution.[1] This case actually involves two moratoria ordered by respondent Tahoe Regional Planning Agency (TRPA) to maintain the status quo while studying the impact of development on Lake Tahoe and designing a strategy for environmentally sound growth. The first, Ordinance 81–5, was effective from August 24, 1981, until August 26, 1983, whereas the second more restrictive Resolution 83–21 was in effect from August 27, 1983, until April 25, 1984. As a result of these two directives, virtually all development on a substantial portion of the property subject to TRPA's jurisdiction was prohibited for a period of 32 months. Although the question we decide relates only to that 32-month period, a brief description of the events leading up to the moratoria and a comment on the two per-

_____

*Thomas F. Reilly* of Massachusetts, *Mike McGrath* of Montana, *John J. Farmer, Jr.,* of New Jersey, *Eliot Spitzer* of New York, *Roy Cooper* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Anabelle Rodriguez* of Puerto Rico, *Sheldon Whitehouse* of Rhode Island, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, and *Christine O. Gregoire* of Washington; for the American Planning Association et al. by *Robert H. Freilich;* for the Council of State Governments et al. by *Richard Ruda* and *Timothy J. Dowling;* for the National Audubon Society et al. by *John D. Echeverria;* and for Thomas Dunne et al. by *Karl M. Manheim.*

*Nancie G. Marzulla* filed a brief for Defenders of Property Rights as *amicus curiae.*

[1] Often referred to as the "Just Compensation Clause," the final Clause of the Fifth Amendment provides: ". . . nor shall private property be taken for public use without just compensation." It applies to the States as well as the Federal Government. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 239, 241 (1897); *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith,* 449 U. S. 155, 160 (1980).

manent plans that TRPA adopted thereafter will clarify the narrow scope of our holding.

## I

The relevant facts are undisputed. The Court of Appeals, while reversing the District Court on a question of law, accepted all of its findings of fact, and no party challenges those findings. All agree that Lake Tahoe is "uniquely beautiful," 34 F. Supp. 2d 1226, 1230 (Nev. 1999), that President Clinton was right to call it a "'national treasure that must be protected and preserved,'" *ibid.*, and that Mark Twain aptly described the clarity of its waters as "'not *merely* transparent, but dazzlingly, brilliantly so,'" *ibid.* (emphasis added) (quoting M. Twain, Roughing It 174–175 (1872)).

Lake Tahoe's exceptional clarity is attributed to the absence of algae that obscures the waters of most other lakes. Historically, the lack of nitrogen and phosphorous, which nourish the growth of algae, has ensured the transparency of its waters.[2] Unfortunately, the lake's pristine state has deteriorated rapidly over the past 40 years; increased land development in the Lake Tahoe Basin (Basin) has threatened the "'noble sheet of blue water'" beloved by Twain and countless others. 34 F. Supp. 2d, at 1230. As the District Court found, "[d]ramatic decreases in clarity first began to be noted in the late 1950's/early 1960's, shortly after development at the lake began in earnest." *Id.*, at 1231. The lake's unsurpassed beauty, it seems, is the wellspring of its undoing.

---

[2] According to a Senate Report: "Only two other sizable lakes in the world are of comparable quality—Crater Lake in Oregon, which is protected as part of the Crater Lake National Park, and Lake Baikal in the [former] Soviet Union. Only Lake Tahoe, however, is so readily accessible from large metropolitan centers and is so adaptable to urban development." S. Rep. No. 91–510, pp. 3–4 (1969).

The upsurge of development in the area has caused "increased nutrient loading of the lake largely because of the increase in impervious coverage of land in the Basin resulting from that development." *Ibid.*

"Impervious coverage—such as asphalt, concrete, buildings, and even packed dirt—prevents precipitation from being absorbed by the soil. Instead, the water is gathered and concentrated by such coverage. Larger amounts of water flowing off a driveway or a roof have more erosive force than scattered raindrops falling over a dispersed area—especially one covered with indigenous vegetation, which softens the impact of the raindrops themselves." *Ibid.*

Given this trend, the District Court predicted that "unless the process is stopped, the lake will lose its clarity and its trademark blue color, becoming green and opaque for eternity."[3]

Those areas in the Basin that have steeper slopes produce more runoff; therefore, they are usually considered "high hazard" lands. Moreover, certain areas near streams or wetlands known as "Stream Environment Zones" (SEZs) are especially vulnerable to the impact of development because, in their natural state, they act as filters for much of the debris that runoff carries. Because "[t]he most obvious response to this problem . . . is to restrict development around the lake—especially in SEZ lands, as well as in areas already naturally prone to runoff," *id.*, at 1232, conservation efforts have focused on controlling growth in these high hazard areas.

In the 1960's, when the problems associated with the burgeoning development began to receive significant atten-

---

[3] The District Court added: "Or at least, for a very, very long time. Estimates are that, should the lake turn green, it could take over 700 years for it to return to its natural state, if that were ever possible at all." 34 F. Supp. 2d, at 1231.

tion, jurisdiction over the Basin, which occupies 501 square miles, was shared by the States of California and Nevada, five counties, several municipalities, and the Forest Service of the Federal Government. In 1968, the legislatures of the two States adopted the Tahoe Regional Planning Compact, see 1968 Cal. Stats. no. 998, p. 1900, § 1; 1968 Nev. Stats. p. 4, which Congress approved in 1969, Pub. L. 91–148, 83 Stat. 360. The compact set goals for the protection and preservation of the lake and created TRPA as the agency assigned "to coordinate and regulate development in the Basin and to conserve its natural resources." *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 394 (1979).

Pursuant to the compact, in 1972 TRPA adopted a Land Use Ordinance that divided the land in the Basin into seven "land capability districts," based largely on steepness but also taking into consideration other factors affecting runoff. Each district was assigned a "land coverage coefficient—a recommended limit on the percentage of such land that could be covered by impervious surface." Those limits ranged from 1% for districts 1 and 2 to 30% for districts 6 and 7. Land in districts 1, 2, and 3 is characterized as "high hazard" or "sensitive," while land in districts 4, 5, 6, and 7 is "low hazard" or "non-sensitive." The SEZ lands, though often treated as a separate category, were actually a subcategory of district 1. 34 F. Supp. 2d, at 1232.

Unfortunately, the 1972 ordinance allowed numerous exceptions and did not significantly limit the construction of new residential housing. California became so dissatisfied with TRPA that it withdrew its financial support and unilaterally imposed stricter regulations on the part of the Basin located in California. Eventually the two States, with the approval of Congress and the President, adopted an extensive amendment to the compact that became effective on December 19, 1980. Pub. L. 96–551, 94 Stat. 3233; Cal.

Govt. Code Ann. § 66801 (West Supp. 2002); Nev. Rev. Stat. § 277.200 (1980).

The 1980 Tahoe Regional Planning Compact (Compact) redefined the structure, functions, and voting procedures of TRPA, App. 37, 94 Stat. 3235–3238; 34 F. Supp. 2d, at 1233, and directed it to develop regional "environmental threshold carrying capacities"—a term that embraced "standards for air quality, water quality, soil conservation, vegetation preservation and noise." 94 Stat. 3235, 3239. The Compact provided that TRPA "shall adopt" those standards within 18 months, and that "[w]ithin 1 year after" their adoption (i. e., by June 19, 1983), it "shall" adopt an amended regional plan that achieves and maintains those carrying capacities. Id., at 3240. The Compact also contained a finding by the legislatures of California and Nevada "that in order to make effective the regional plan as revised by [TRPA], it is necessary to halt temporarily works of development in the region which might otherwise absorb the entire capability of the region for further development or direct it out of harmony with the ultimate plan." Id., at 3243. Accordingly, for the period prior to the adoption of the final plan ("or until May 1, 1983, whichever is earlier"), the Compact itself prohibited the development of new subdivisions, condominiums, and apartment buildings, and also prohibited each city and county in the Basin from granting any more permits in 1981, 1982, or 1983 than had been granted in 1978.[4]

During this period TRPA was also working on the development of a regional water quality plan to comply with the Clean Water Act, 33 U. S. C. § 1288 (1994 ed.). Despite

---

[4] App. 104–107. This moratorium did not apply to rights that had vested before the effective date of the 1980 Compact. Id., at 107–108. Two months after the 1980 Compact became effective, TRPA adopted its Ordinance 81-1 broadly defining the term "project" to include the construction of any new residence and requiring owners of land in districts 1, 2, or 3, to get a permit from TRPA before beginning construction of homes on their property. 34 F. Supp. 2d 1226, 1233 (Nev. 1999).

the fact that TRPA performed these obligations in "good faith and to the best of its ability," 34 F. Supp. 2d, at 1233, after a few months it concluded that it could not meet the deadlines in the Compact. On June 25, 1981, it therefore enacted Ordinance 81–5 imposing the first of the two moratoria on development that petitioners challenge in this proceeding. The ordinance provided that it would become effective on August 24, 1981, and remain in effect pending the adoption of the permanent plan required by the Compact. App. 159, 191.

The District Court made a detailed analysis of the ordinance, noting that it might even prohibit hiking or picnicking on SEZ lands, but construed it as essentially banning any construction or other activity that involved the removal of vegetation or the creation of land coverage on all SEZ lands, as well as on class 1, 2, and 3 lands in California. 34 F. Supp. 2d, at 1233–1235. Some permits could be obtained for such construction in Nevada if certain findings were made. Id., at 1235. It is undisputed, however, that Ordinance 81–5 prohibited the construction of any new residences on SEZ lands in either State and on class 1, 2, and 3 lands in California.

Given the complexity of the task of defining "environmental threshold carrying capacities" and the division of opinion within TRPA's governing board, the District Court found that it was "unsurprising" that TRPA failed to adopt those thresholds until August 26, 1982, roughly two months after the Compact deadline. Ibid. Under a liberal reading of the Compact, TRPA then had until August 26, 1983, to adopt a new regional plan. 94 Stat. 3240. "Unfortunately, but again not surprisingly, no regional plan was in place as of that date." 34 F. Supp. 2d, at 1235. TRPA therefore adopted Resolution 83–21, "which completely suspended all project reviews and approvals, including the acceptance of new proposals," and which remained in effect until a new regional plan was adopted on April 26, 1984. Thus, Resolu-

tion 83–21 imposed an 8-month moratorium prohibiting all construction on high hazard lands in either State. In combination, Ordinance 81–5 and Resolution 83–21 effectively prohibited all construction on sensitive lands in California and on all SEZ lands in the entire Basin for 32 months, and on sensitive lands in Nevada (other than SEZ lands) for eight months. It is these two moratoria that are at issue in this case.

On the same day that the 1984 plan was adopted, the State of California filed an action seeking to enjoin its implementation on the ground that it failed to establish land-use controls sufficiently stringent to protect the Basin. *Id.*, at 1236. The District Court entered an injunction that was upheld by the Court of Appeals and remained in effect until a completely revised plan was adopted in 1987. Both the 1984 injunction and the 1987 plan contained provisions that prohibited new construction on sensitive lands in the Basin. As the case comes to us, however, we have no occasion to consider the validity of those provisions.

## II

Approximately two months after the adoption of the 1984 plan, petitioners filed parallel actions against TRPA and other defendants in federal courts in Nevada and California that were ultimately consolidated for trial in the District of Nevada. The petitioners include the Tahoe-Sierra Preservation Council, Inc., a nonprofit membership corporation representing about 2,000 owners of both improved and unimproved parcels of real estate in the Lake Tahoe Basin, and a class of some 400 individual owners of vacant lots located either on SEZ lands or in other parts of districts 1, 2, or 3. Those individuals purchased their properties prior to the effective date of the 1980 Compact, App. 34, primarily for the purpose of constructing "at a time of their choosing" a single-family home "to serve as a permanent, retirement or

vacation residence," *id.*, at 36. When they made those purchases, they did so with the understanding that such construction was authorized provided that "they complied with all reasonable requirements for building." *Ibid.*[5]

Petitioners' complaints gave rise to protracted litigation that has produced four opinions by the Court of Appeals for the Ninth Circuit and several published District Court opinions.[6] For present purposes, however, we need only describe those courts' disposition of the claim that three actions taken by TRPA—Ordinance 81–5, Resolution 83–21, and the 1984 regional plan—constituted takings of petitioners' property without just compensation.[7] Indeed, the challenge to the 1984 plan is not before us because both the District Court and the Court of Appeals held that it was the federal injunction against implementing that plan, rather than the plan itself, that caused the post-1984 injuries that petitioners allegedly suffered, and those rulings are not encompassed within our limited grant of certiorari.[8] Thus,

---

[5] As explained, *supra*, at 309, the petitioners who purchased land after the 1972 compact did so amidst a heavily regulated zoning scheme. Their property was already classified as part of land capability districts 1, 2, and 3, or SEZ land. And each land classification was subject to regulations as to the degree of artificial disturbance the land could safely sustain.

[6] 911 F. 2d 1331 (1990); 938 F. 2d 153 (1991); 34 F. 3d 753 (1994); 216 F. 3d 764 (2000); 611 F. Supp. 110 (1985); 808 F. Supp. 1474 (1992); 808 F. Supp. 1484 (1992).

[7] In 1991, petitioners amended their complaint to allege that the adoption of the 1987 plan also constituted an unconstitutional taking. Ultimately both the District Court and the Court of Appeals held that this claim was barred by California's 1-year statute of limitations and Nevada's 2-year statute of limitations. See 216 F. 3d, at 785–789. Although the validity of the 1987 plan is not before us, we note that other litigants have challenged certain applications of that plan. See *Suitum* v. *Tahoe Regional Planning Agency*, 520 U. S. 725 (1997).

[8] In his dissent, THE CHIEF JUSTICE contends that the 1984 plan is before us because the 1980 Compact is a proximate cause of petitioners'

we limit our discussion to the lower courts' disposition of the claims based on the 2-year moratorium (Ordinance 81–5) and the ensuing 8-month moratorium (Resolution 83–21).

The District Court began its constitutional analysis by identifying the distinction between a direct government appropriation of property without just compensation and a government regulation that imposes such a severe restriction on the owner's use of her property that it produces "nearly the same result as a direct appropriation." 34 F. Supp. 2d, at 1238. The court noted that all of the claims in this case "are of the 'regulatory takings' variety." *Id.*, at 1239. Citing our decision in *Agins* v. *City of Tiburon*, 447 U. S. 255 (1980), it then stated that a "regulation will constitute a taking when either: (1) it does not substantially advance a legitimate state interest; or (2) it denies the owner economically viable use of her land." 34 F. Supp. 2d, at 1239. The District Court rejected the first alternative based on its finding that "further development on high hazard lands such as [petitioners'] would lead to significant additional damage to the lake." *Id.*, at 1240.[9] With respect

---

injuries, *post*, at 343–345. Petitioners, however, do not challenge the Court of Appeals' holding on causation in their briefs on the merits, presumably because they understood when we granted certiorari on the question "[w]hether the Court of Appeals properly determined that a temporary moratorium on land development does not constitute a taking of property requiring compensation under the Takings Clause of the United States Constitution," 533 U. S. 948 (2001), we were only interested in the narrow question decided today. Throughout the District Court and Court of Appeals decisions the phrase "temporary moratorium" refers to two things and two things only: Ordinance 81–5 and Resolution 83–21. The dissent's novel theory of causation was not briefed, nor was it discussed during oral argument.

[9] As the District Court explained: "There is a direct connection between the potential development of plaintiffs' lands and the harm the lake would suffer as a result thereof. Further, there has been no suggestion by the plaintiffs that any less severe response would have adequately addressed the problems the lake was facing. Thus it is difficult to see

to the second alternative, the court first considered whether the analysis adopted in *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), would lead to the conclusion that TRPA had effected a "partial taking," and then whether those actions had effected a "total taking." [10]

Emphasizing the temporary nature of the regulations, the testimony that the "average holding time of a lot in the Tahoe area between lot purchase and home construction is twenty-five years," and the failure of petitioners to offer specific evidence of harm, the District Court concluded that "consideration of the *Penn Central* factors clearly leads to the conclusion that there was no taking." 34 F. Supp. 2d, at 1240. In the absence of evidence regarding any of the individual plaintiffs, the court evaluated the "average" purchasers' intent and found that such purchasers "did not have reasonable, investment-backed expectations that they would be able to build single-family homes on their land within the six-year period involved in this lawsuit." *Id.*, at 1241. [11]

---

how a more proportional response could have been adopted. Given that TRPA's actions had widespread application, and were not aimed at an individual landowner, the plaintiffs would appear to bear the burden of proof on this point. They have not met this burden—nor have they really attempted to do so. Although unwilling to stipulate to the fact that TRPA's actions substantially advanced a legitimate state interest, the plaintiffs did not seriously contest the matter at trial." 34 F. Supp. 2d, at 1240 (citation omitted).

[10] The *Penn Central* analysis involves "a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Palazzolo* v. *Rhode Island*, 533 U. S. 606, 617 (2001).

[11] The court stated that petitioners "had plenty of time to build before the restrictions went into effect—and almost everyone in the Tahoe Basin knew in the late 1970s that a crackdown on development was in the works." In addition, the court found "the fact that no evidence was introduced regarding the specific diminution in value of any of the plaintiffs' individual properties clearly weighs against a finding that there was a partial taking of the plaintiffs' property." 34 F. Supp. 2d, at 1241.

The District Court had more difficulty with the "total taking" issue. Although it was satisfied that petitioners' property did retain some value during the moratoria,[12] it found that they had been temporarily deprived of "all economically viable use of their land." *Id.*, at 1245. The court concluded that those actions therefore constituted "categorical" takings under our decision in *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003 (1992). It rejected TRPA's response that Ordinance 81–5 and Resolution 83–21 were "reasonable temporary planning moratoria" that should be excluded from *Lucas'* categorical approach. The court thought it "fairly clear" that such interim actions would not have been viewed as takings prior to our decisions in *Lucas* and *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304 (1987), because "[z]oning boards, cities, counties and other agencies used them all the time to 'maintain the status quo pending study and governmental decision making.'" 34 F. Supp. 2d, at 1248–1249 (quoting *Williams* v. *Central*, 907 P. 2d 701, 706 (Colo. App. 1995)). After expressing uncertainty as to whether those cases required a holding that moratoria on development automatically effect takings, the court concluded that TRPA's actions did so, partly because neither the ordinance nor the resolution, even though intended to be temporary from the beginning, contained an

---

[12] The pretrial order describes purchases by the United States Forest Service of private lots in environmentally sensitive areas during the periods when the two moratoria were in effect. During the 2-year period ending on August 26, 1983, it purchased 215 parcels in California at an average price of over $19,000 and 45 parcels in Nevada at an average price of over $39,000; during the ensuing 8-month period, it purchased 167 California parcels at an average price of over $29,000 and 27 Nevada parcels at an average price of over $41,000. App. 76–77. Moreover, during those periods some owners sold sewer and building allocations to owners of higher capability lots "for between $15,000 and $30,000." *Id.*, at 77.

express termination date. 34 F. Supp. 2d, at 1250–1251.[13] Accordingly, it ordered TRPA to pay damages to most petitioners for the 32-month period from August 24, 1981, to April 25, 1984, and to those owning class 1, 2, or 3 property in Nevada for the 8-month period from August 27, 1983, to April 25, 1984. *Id.*, at 1255.

Both parties appealed. TRPA successfully challenged the District Court's takings determination, and petitioners unsuccessfully challenged the dismissal of their claims based on the 1984 and 1987 plans. Petitioners did not, however, challenge the District Court's findings or conclusions concerning its application of *Penn Central.* With respect to the two moratoria, the Ninth Circuit noted that petitioners had expressly disavowed an argument "that the regulations constitute a taking under the ad hoc balancing approach described in *Penn Central*" and that they did not "dispute that the restrictions imposed on their properties are appropriate means of securing the purpose set forth in the Compact."[14] Accordingly, the only question before the court was "whether the rule set forth in *Lucas* applies—that is, whether a cate-

---

[13] Ordinance 81–5 specified that it would terminate when the regional plan became finalized. And Resolution 83–21 was limited to 90 days, but was renewed for an additional term. Nevertheless, the District Court distinguished these measures from true "temporary" moratoria because there was no fixed date for when they would terminate. 34 F. Supp. 2d, at 1250–1251.

[14] 216 F. 3d, at 773. "Below, the district court ruled that the regulations did not constitute a taking under *Penn Central*'s ad hoc approach, but that they did constitute a categorical taking under *Lucas* [v. *South Carolina Coastal Council*, 505 U. S. 1003 (1992)]. See *Tahoe-Sierra Preservation Council*, 34 F. Supp. 2d at 1238–45. The defendants appealed the district court's latter holding, but the plaintiffs did not appeal the former. And even if arguments regarding the *Penn Central* test were fairly encompassed by the defendants' appeal, the plaintiffs have stated explicitly on this appeal that they do not argue that the regulations constitute a taking under the ad hoc balancing approach described in *Penn Central*." *Ibid.*

gorical taking occurred because Ordinance 81–5 and Reso-
lution 83–21 denied the plaintiffs 'all economically benefi-
cial or productive use of land.'" 216 F. 3d 764, 773 (2000).
Moreover, because petitioners brought only a facial chal-
lenge, the narrow inquiry before the Court of Appeals was
whether the mere enactment of the regulations constituted
a taking.

Contrary to the District Court, the Court of Appeals held
that because the regulations had only a temporary impact
on petitioners' fee interest in the properties, no categorical
taking had occurred. It reasoned:

> "Property interests may have many different dimen-
> sions. For example, the dimensions of a property in-
> terest may include a physical dimension (which de-
> scribes the size and shape of the property in question),
> a functional dimension (which describes the extent to
> which an owner may use or dispose of the property in
> question), and a temporal dimension (which describes
> the duration of the property interest). At base, the
> plaintiffs' argument is that we should conceptually
> sever each plaintiff's fee interest into discrete segments
> in at least one of these dimensions—the temporal one—
> and treat each of those segments as separate and dis-
> tinct property interests for purposes of takings analysis.
> Under this theory, they argue that there was a cate-
> gorical taking of one of those temporal segments."
> *Id.*, at 774.

Putting to one side "cases of physical invasion or occupa-
tion," *ibid.*, the court read our cases involving regulatory
taking claims to focus on the impact of a regulation on the
parcel as a whole. In its view a "planning regulation that
prevents the development of a parcel for a temporary pe-
riod of time is conceptually no different than a land-use
restriction that permanently denies all use on a discrete
portion of property, or that permanently restricts a type

of use across all of the parcel." *Id.*, at 776. In each situation, a regulation that affects only a portion of the parcel—whether limited by time, use, or space—does not deprive the owner of all economically beneficial use.[15]

The Court of Appeals distinguished *Lucas* as applying to the "'relatively rare'" case in which a regulation denies all productive use of an entire parcel, whereas the moratoria involve only a "temporal 'slice'" of the fee interest and a form of regulation that is widespread and well established. 216 F. 3d, at 773–774. It also rejected petitioners' argument that our decision in *First English* was controlling. According to the Court of Appeals, *First English* concerned the question whether compensation is an appropriate remedy for a temporary taking and not whether or when such a taking has occurred. 216 F. 3d, at 778. Faced squarely with the question whether a taking had occurred, the court held that *Penn Central* was the appropriate framework for analysis. Petitioners, however, had failed to challenge the District

---

[15] The Court of Appeals added:

"Each of these three types of regulation will have an impact on the parcel's value, because each will affect an aspect of the owner's 'use' of the property—by restricting *when* the 'use' may occur, *where* the 'use' may occur, or *how* the 'use' may occur. Prior to *Agins* [v. *City of Tiburon*, 447 U. S. 255 (1980)], the Court had already rejected takings challenges to regulations eliminating all 'use' on a portion of the property, and to regulations restricting the type of 'use' across the breadth of the property. *See Penn Central*, 438 U. S. at 130–31 . . . ; *Keystone Bituminous Coal Ass'n*, 480 U. S. at 498–99 . . . ; *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 384, 397 . . . (1926) (75% diminution in value caused by zoning law); *see also William C. Haas & Co.* v. *City & County of San Francisco*, 605 F. 2d 1117, 1120 (9th Cir. 1979) (value reduced from $2,000,000 to $100,000). In those cases, the Court 'uniformly reject[ed] the proposition that diminution in property value, standing alone, can establish a "taking."' *Penn Central*, 438 U. S. at 131 . . . ; *see also Concrete Pipe and Products, Inc.* v. *Construction Laborers Pension Trust*, 508 U. S. 602, 645 . . . (1993). There is no plausible basis on which to distinguish a similar diminution in value that results from a temporary suspension of development." *Id.*, at 776–777.

Court's conclusion that they could not make out a taking claim under the *Penn Central* factors.

Over the dissent of five judges, the Ninth Circuit denied a petition for rehearing en banc. 228 F. 3d 998 (2000). In the dissenters' opinion, the panel's holding was not faithful to this Court's decisions in *First English* and *Lucas,* nor to Justice Holmes admonition in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 416 (1922), that "'a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.'" 228 F. 3d, at 1003. Because of the importance of the case, we granted certiorari limited to the question stated at the beginning of this opinion. 533 U. S. 948 (2001). We now affirm.

## III

Petitioners make only a facial attack on Ordinance 81–5 and Resolution 83–21. They contend that the mere enactment of a temporary regulation that, while in effect, denies a property owner all viable economic use of her property gives rise to an unqualified constitutional obligation to compensate her for the value of its use during that period. Hence, they "face an uphill battle," *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470, 495 (1987), that is made especially steep by their desire for a categorical rule requiring compensation whenever the government imposes such a moratorium on development. Under their proposed rule, there is no need to evaluate the landowners' investment-backed expectations, the actual impact of the regulation on any individual, the importance of the public interest served by the regulation, or the reasons for imposing the temporary restriction. For petitioners, it is enough that a regulation imposes a temporary deprivation— no matter how brief—of all economically viable use to trigger a *per se* rule that a taking has occurred. Petitioners assert that our opinions in *First English* and *Lucas* have

already endorsed their view, and that it is a logical applica-
tion of the principle that the Takings Clause was "designed
to bar Government from forcing some people alone to bear
burdens which, in all fairness and justice, should be borne
by the public as a whole." *Armstrong* v. *United States*, 364
U. S. 40, 49 (1960).

We shall first explain why our cases do not support their
proposed categorical rule—indeed, fairly read, they implic-
itly reject it. Next, we shall explain why the *Armstrong*
principle requires rejection of that rule as well as the less
extreme position advanced by petitioners at oral argument.
In our view the answer to the abstract question whether
a temporary moratorium effects a taking is neither "yes,
always" nor "no, never"; the answer depends upon the par-
ticular circumstances of the case.[16] Resisting "[t]he temp-
tation to adopt what amount to *per se* rules in either direc-
tion," *Palazzolo* v. *Rhode Island*, 533 U. S. 606, 636 (2001)
(O'CONNOR, J., concurring), we conclude that the circum-
stances in this case are best analyzed within the *Penn Cen-
tral* framework.

## IV

The text of the Fifth Amendment itself provides a basis
for drawing a distinction between physical takings and regu-
latory takings. Its plain language requires the payment of
compensation whenever the government acquires private
property for a public purpose, whether the acquisition is
the result of a condemnation proceeding or a physical ap-
propriation. But the Constitution contains no comparable
reference to regulations that prohibit a property owner from

---

[16] Despite our clear refusal to hold that a moratorium never effects a
taking, THE CHIEF JUSTICE accuses us of "allow[ing] the government to
'. . . take private property without paying for it,'" *post*, at 349. It may
be true that under a *Penn Central* analysis petitioners' land was taken
and compensation would be due. But petitioners failed to challenge the
District Court's conclusion that there was no taking under *Penn Central.*
*Supra,* at 317, and n. 14.

making certain uses of her private property.[17] Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by "essentially ad hoc, factual inquiries," *Penn Central,* 438 U. S., at 124, designed to allow "careful examination and weighing of all the relevant circumstances." *Palazzolo,* 533 U. S., at 636 (O'CONNOR, J., concurring).

When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, *United States v. Pewee Coal Co.,* 341 U. S. 114, 115 (1951), regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. *United States v. General Motors Corp.,* 323 U. S. 373 (1945); *United States v. Petty Motor Co.,* 327 U. S. 372 (1946). Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants, *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U. S. 419 (1982); or when its planes use private airspace to approach a government airport, *United States v. Causby,* 328 U. S. 256 (1946), it is required to pay for that share no matter how small. But a government regulation that merely prohibits landlords from evicting

---

[17] In determining whether government action affecting property is an unconstitutional deprivation of ownership rights under the Just Compensation Clause, a court must interpret the word "taken." When the government condemns or physically appropriates the property, the fact of a taking is typically obvious and undisputed. When, however, the owner contends a taking has occurred because a law or regulation imposes restrictions so severe that they are tantamount to a condemnation or appropriation, the predicate of a taking is not self-evident, and the analysis is more complex.

tenants unwilling to pay a higher rent, *Block* v. *Hirsh*, 256 U. S. 135 (1921); that bans certain private uses of a portion of an owner's property, *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926); *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470 (1987); or that forbids the private use of certain airspace, *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), does not constitute a categorical taking. "The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee* v. *Escondido*, 503 U. S. 519, 523 (1992). See also *Loretto*, 458 U. S., at 440; *Keystone*, 480 U. S., at 489, n. 18.

This longstanding distinction between acquisitions of property for public use, on the one hand, and regulations prohibiting private uses, on the other, makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a "regulatory taking,"[18] and vice versa. For the same reason that we do not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically valuable use, we do not apply our precedent from the physical takings con-

---

[18] To illustrate the importance of the distinction, the Court in *Loretto*, 458 U. S., at 430, compared two wartime takings cases, *United States* v. *Pewee Coal Co.*, 341 U. S. 114, 116 (1951), in which there had been an "actual taking of possession and control" of a coal mine, and *United States* v. *Central Eureka Mining Co.*, 357 U. S. 155 (1958), in which, "by contrast, the Court found no taking where the Government had issued a wartime order requiring nonessential gold mines to cease operations . . . ." 458 U. S., at 431. *Loretto* then relied on this distinction in dismissing the argument that our discussion of the physical taking at issue in the case would affect landlord-tenant laws. "So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity." *Id.*, at 440 (citing *Penn Central*).

text to regulatory takings claims. Land-use regulations are ubiquitous and most of them impact property values in some tangential way—often in completely unanticipated ways. Treating them all as *per se* takings would transform government regulation into a luxury few governments could afford. By contrast, physical appropriations are relatively rare, easily identified, and usually represent a greater affront to individual property rights.[19] "This case does not present the 'classi[c] taking' in which the government directly appropriates private property for its own use," *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, 522 (1998); instead the interference with property rights "arises from some public program adjusting the benefits and burdens of eco-

---

[19] According to THE CHIEF JUSTICE's dissent, even a temporary, use-prohibiting regulation should be governed by our physical takings cases because, under *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1017 (1992), "from the landowner's point of view," the moratorium is the functional equivalent of a forced leasehold, *post*, at 348. Of course, from both the landowner's and the government's standpoint there are critical differences between a leasehold and a moratorium. Condemnation of a leasehold gives the government possession of the property, the right to admit and exclude others, and the right to use it for a public purpose. A regulatory taking, by contrast, does not give the government any right to use the property, nor does it dispossess the owner or affect her right to exclude others.

THE CHIEF JUSTICE stretches *Lucas'* "equivalence" language too far. For even a regulation that constitutes only a minor infringement on property may, from the landowner's perspective, be the functional equivalent of an appropriation. *Lucas* carved out a narrow exception to the rules governing regulatory takings for the "extraordinary circumstance" of a permanent deprivation of all beneficial use. The exception was only partially justified based on the "equivalence" theory cited by THE CHIEF JUSTICE's dissent. It was also justified on the theory that, in the "relatively rare situations where the government has deprived a landowner of all economically beneficial uses," it is less realistic to assume that the regulation will secure an "average reciprocity of advantage," or that government could not go on if required to pay for every such restriction. 505 U. S., at 1017–1018. But as we explain, *infra*, at 339–341, these assumptions hold true in the context of a moratorium.

nomic life to promote the common good," *Penn Central*, 438 U. S., at 124.

Perhaps recognizing this fundamental distinction, petitioners wisely do not place all their emphasis on analogies to physical takings cases. Instead, they rely principally on our decision in *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003 (1992)—a regulatory takings case that, nevertheless, applied a categorical rule—to argue that the *Penn Central* framework is inapplicable here. A brief review of some of the cases that led to our decision in *Lucas*, however, will help to explain why the holding in that case does not answer the question presented here.

As we noted in *Lucas*, it was Justice Holmes' opinion in *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922),[20] that gave birth to our regulatory takings jurisprudence.[21]

---

[20] The case involved "a bill in equity brought by the defendants in error to prevent the Pennsylvania Coal Company from mining under their property in such way as to remove the supports and cause a subsidence of the surface and of their house." *Mahon*, 260 U. S., at 412. Mahon sought to prevent Pennsylvania Coal from mining under his property by relying on a state statute, which prohibited any mining that could undermine the foundation of a home. The company challenged the statute as a taking of its interest in the coal without compensation.

[21] In *Lucas*, we explained: "Prior to Justice Holmes's exposition in *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922), it was generally thought that the Takings Clause reached only a 'direct appropriation' of property, *Legal Tender Cases*, 12 Wall. 457, 551 (1871), or the functional equivalent of a 'practical ouster of [the owner's] possession,' *Transportation Co.* v. *Chicago*, 99 U. S. 635, 642 (1879) . . . . Justice Holmes recognized in *Mahon*, however, that if the protection against physical appropriations of private property was to be meaningfully enforced, the government's power to redefine the range of interests included in the ownership of property was necessarily constrained by constitutional limits. 260 U. S., at 414–415. If, instead, the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].' *Id.*, at 415. These considerations gave birth in that case to the oft-cited maxim that, 'while property may be regulated to a certain extent, if regulation goes too

In subsequent opinions we have repeatedly and consistently endorsed Holmes' observation that "if regulation goes too far it will be recognized as a taking." *Id.*, at 415. Justice Holmes did not provide a standard for determining when a regulation goes "too far," but he did reject the view expressed in Justice Brandeis' dissent that there could not be a taking because the property remained in the possession of the owner and had not been appropriated or used by the public.[22] After *Mahon*, neither a physical appropriation nor a public use has ever been a necessary component of a "regulatory taking."

In the decades following that decision, we have "generally eschewed" any set formula for determining how far is too far, choosing instead to engage in "'essentially ad hoc, factual inquiries.'" *Lucas*, 505 U. S., at 1015 (quoting *Penn Central*, 438 U. S., at 124). Indeed, we still resist the temptation to adopt *per se* rules in our cases involving partial regulatory takings, preferring to examine "a number of factors" rather than a simple "mathematically precise" formula.[23] Justice Brennan's opinion for the Court in *Penn*

---

far it will be recognized as a taking.' *Ibid.*" 505 U. S., at 1014 (citation omitted).

[22] Justice Brandeis argued: "Every restriction upon the use of property imposed in the exercise of the police power deprives the owner of some right theretofore enjoyed, and is, in that sense, an abridgment by the State of rights in property without making compensation. But restriction imposed to protect the public health, safety or morals from dangers threatened is not a taking. The restriction here in question is merely the prohibition of a noxious use. The property so restricted remains in the possession of its owner. The State does not appropriate it or make any use of it. The State merely prevents the owner from making a use which interferes with paramount rights of the public." *Mahon*, 260 U. S., at 417 (dissenting opinion).

[23] In her concurring opinion in *Palazzolo*, 533 U. S., at 633, JUSTICE O'CONNOR reaffirmed this approach: "Our polestar instead remains the principles set forth in *Penn Central* itself and our other cases that govern partial regulatory takings. Under these cases, interference with investment-backed expectations is one of a number of factors that a

*Central* did, however, make it clear that even though multiple factors are relevant in the analysis of regulatory takings claims, in such cases we must focus on "the parcel as a whole":

> "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole—here, the city tax block designated as the 'landmark site.'" *Id.*, at 130–131.

This requirement that "the aggregate must be viewed in its entirety" explains why, for example, a regulation that prohibited commercial transactions in eagle feathers, but did not bar other uses or impose any physical invasion or restraint upon them, was not a taking. *Andrus* v. *Allard*, 444 U. S. 51, 66 (1979). It also clarifies why restrictions on the use of only limited portions of the parcel, such as setback ordinances, *Gorieb* v. *Fox*, 274 U. S. 603 (1927), or a requirement that coal pillars be left in place to prevent mine subsidence, *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S., at 498, were not considered regulatory takings. In each of these cases, we affirmed that "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking." *Andrus*, 444 U. S., at 65–66.

---

court must examine." *Ibid.* "*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required." *Id.*, at 634. "The temptation to adopt what amount to *per se* rules in either direction must be resisted. The Takings Clause requires careful examination and weighing of all the relevant circumstances in this context." *Id.*, at 636.

While the foregoing cases considered whether particular regulations had "gone too far" and were therefore invalid, none of them addressed the separate remedial question of how compensation is measured once a regulatory taking is established. In his dissenting opinion in *San Diego Gas & Elec. Co.* v. *San Diego*, 450 U. S. 621, 636 (1981), Justice Brennan identified that question and explained how he would answer it:

> "The constitutional rule I propose requires that, once a court finds that a police power regulation has effected a 'taking,' the government entity must pay just compensation for the period commencing on the date the regulation first effected the 'taking,' and ending on the date the government entity chooses to rescind or otherwise amend the regulation." *Id.*, at 658.

Justice Brennan's proposed rule was subsequently endorsed by the Court in *First English*, 482 U. S., at 315, 318, 321. *First English* was certainly a significant decision, and nothing that we say today qualifies its holding. Nonetheless, it is important to recognize that we did not address in that case the quite different and logically prior question whether the temporary regulation at issue had in fact constituted a taking.

In *First English*, the Court unambiguously and repeatedly characterized the issue to be decided as a "compensation question" or a "remedial question." *Id.*, at 311 ("The disposition of the case on these grounds isolates the remedial question for our consideration"); see also *id.*, at 313, 318. And the Court's statement of its holding was equally unambiguous: "We merely hold that where the government's activities *have already worked a taking* of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *Id.*, at 321 (emphasis added). In fact, *First English* expressly disavowed any ruling on the

merits of the takings issue because the California courts had decided the remedial question on the assumption that a taking had been alleged. *Id.*, at 312–313 ("We reject appellee's suggestion that . . . we must independently evaluate the adequacy of the complaint and resolve the takings claim on the merits before we can reach the remedial question"). After our remand, the California courts concluded that there had not been a taking, *First English Evangelical Church of Glendale* v. *County of Los Angeles*, 210 Cal. App. 3d 1353, 258 Cal. Rptr. 893 (1989), and we declined review of that decision, 493 U. S. 1056 (1990).

To the extent that the Court in *First English* referenced the antecedent takings question, we identified two reasons why a regulation temporarily denying an owner all use of her property might not constitute a taking. First, we recognized that "the county might avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as a part of the State's authority to enact safety regulations." 482 U. S., at 313. Second, we limited our holding "to the facts presented" and recognized "the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which [were] not before us." *Id.*, at 321. Thus, our decision in *First English* surely did not approve, and implicitly rejected, the categorical submission that petitioners are now advocating.

Similarly, our decision in *Lucas* is not dispositive of the question presented. Although *Lucas* endorsed and applied a categorical rule, it was not the one that petitioners propose. Lucas purchased two residential lots in 1988 for $975,000. These lots were rendered "valueless" by a statute enacted two years later. The trial court found that a taking had occurred and ordered compensation of $1,232,387.50, representing the value of the fee simple estate, plus interest. As the statute read at the time of the trial, it effected a taking that "was unconditional and permanent." 505 U. S.,

at 1012.  While the State's appeal was pending, the statute was amended to authorize exceptions that might have allowed Lucas to obtain a building permit.  Despite the fact that the amendment gave the State Supreme Court the opportunity to dispose of the appeal on ripeness grounds, it resolved the merits of the permanent takings claim and reversed.  Since "Lucas had no reason to proceed on a 'temporary taking' theory at trial," we decided the case on the permanent taking theory that both the trial court and the State Supreme Court had addressed.  *Ibid.*

The categorical rule that we applied in *Lucas* states that compensation is required when a regulation deprives an owner of "*all* economically beneficial uses" of his land.  *Id.,* at 1019.  Under that rule, a statute that "wholly eliminated the value" of Lucas' fee simple title clearly qualified as a taking.  But our holding was limited to "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted."  *Id.,* at 1017.  The emphasis on the word "no" in the text of the opinion was, in effect, reiterated in a footnote explaining that the categorical rule would not apply if the diminution in value were 95% instead of 100%.  *Id.,* at 1019, n. 8.[24]  Anything less than a "complete elimination of value," or a "total loss," the Court acknowledged, would require the kind of analysis applied in *Penn Central.*  *Lucas,* 505 U. S., at 1019–1020, n. 8.[25]

Certainly, our holding that the permanent "obliteration of the value" of a fee simple estate constitutes a categorical taking does not answer the question whether a regulation

---

[24] JUSTICE KENNEDY concurred in the judgment on the basis of the regulation's impact on "reasonable, investment-backed expectations."  505 U. S., at 1034.

[25] It is worth noting that *Lucas* underscores the difference between physical and regulatory takings.  See *supra,* at 322–325.  For under our physical takings cases it would be irrelevant whether a property owner maintained 5% of the value of her property so long as there was a physical appropriation of any of the parcel.

prohibiting any economic use of land for a 32-month period has the same legal effect. Petitioners seek to bring this case under the rule announced in *Lucas* by arguing that we can effectively sever a 32-month segment from the remainder of each landowner's fee simple estate, and then ask whether that segment has been taken in its entirety by the moratoria. Of course, defining the property interest taken in terms of the very regulation being challenged is circular. With property so divided, every delay would become a total ban; the moratorium and the normal permit process alike would constitute categorical takings. Petitioners' "conceptual severance" argument is unavailing because it ignores *Penn Central*'s admonition that in regulatory takings cases we must focus on "the parcel as a whole." 438 U. S., at 130–131. We have consistently rejected such an approach to the "denominator" question. See *Keystone*, 480 U. S., at 497. See also *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602, 644 (1993) ("To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question"). Thus, the District Court erred when it disaggregated petitioners' property into temporal segments corresponding to the regulations at issue and then analyzed whether petitioners were deprived of all economically viable use during each period. 34 F. Supp. 2d, at 1242–1245. The starting point for the court's analysis should have been to ask whether there was a total taking of the entire parcel; if not, then *Penn Central* was the proper framework.[26]

An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the

---

[26] THE CHIEF JUSTICE's dissent makes the same mistake by carving out a 6-year interest in the property, rather than considering the parcel as a whole, and treating the regulations covering that segment as analogous to a total taking under *Lucas, post*, at 351.

term of years that describes the temporal aspect of the owner's interest. See Restatement of Property §§ 7–9 (1936). Both dimensions must be considered if the interest is to be viewed in its entirety. Hence, a permanent deprivation of the owner's use of the entire area is a taking of "the parcel as a whole," whereas a temporary restriction that merely causes a diminution in value is not. Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted. Cf. *Agins* v. *City of Tiburon*, 447 U. S., at 263, n. 9 ("Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense'" (quoting *Danforth* v. *United States*, 308 U. S. 271, 285 (1939))).

Neither *Lucas*, nor *First English*, nor any of our other regulatory takings cases compels us to accept petitioners' categorical submission. In fact, these cases make clear that the categorical rule in *Lucas* was carved out for the "extraordinary case" in which a regulation permanently deprives property of all value; the default rule remains that, in the regulatory taking context, we require a more fact specific inquiry. Nevertheless, we will consider whether the interest in protecting individual property owners from bearing public burdens "which, in all fairness and justice, should be borne by the public as a whole," *Armstrong* v. *United States*, 364 U. S., at 49, justifies creating a new rule for these circumstances.[27]

---

[27] *Armstrong*, like *Lucas*, was a case that involved the "total destruction by the Government of all value" in a specific property interest. 364 U. S., at 48–49. It is nevertheless perfectly clear that Justice Black's oft-quoted comment about the underlying purpose of the guarantee that private prop-

## V

Considerations of "fairness and justice" arguably could support the conclusion that TRPA's moratoria were takings of petitioners' property based on any of seven different theories. First, even though we have not previously done so, we might now announce a categorical rule that, in the interest of fairness and justice, compensation is required whenever government temporarily deprives an owner of all economically viable use of her property. Second, we could craft a narrower rule that would cover all temporary land-use restrictions except those "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like" which were put to one side in our opinion in *First English,* 482 U. S., at 321. Third, we could adopt a rule like the one suggested by an *amicus* supporting petitioners that would "allow a short fixed period for deliberations to take place without compensation—say maximum one year—after which the just compensation requirements" would "kick in." [28] Fourth, with the benefit of hindsight, we might characterize the successive actions of TRPA as a "series of rolling moratoria" that were the functional equivalent of a permanent taking.[29] Fifth, were it not for the findings of the District Court that TRPA acted diligently and in good faith, we might have concluded that the agency was stalling in order to avoid promulgating the environmental threshold carrying capacities and regional plan mandated by the 1980 Compact. Cf. *Monterey* v. *Del Monte Dunes at*

---

erty shall not be taken for a public use without just compensation applies to partial takings as well as total takings.

[28] Brief for the Institute for Justice as *Amicus Curiae* 30. Although *amicus* describes the 1-year cutoff proposal as the "better approach by far," *ibid.,* its primary argument is that *Penn Central* should be overruled, *id.,* at 20 ("*All* partial takings by way of land use restriction should be subject to the same prima facie rules for compensation as a physical occupation for a limited period of time").

[29] Brief for Petitioners 44. See also Pet. for Cert. i.

*Monterey, Ltd.,* 526 U. S. 687, 698 (1999). Sixth, apart from the District Court's finding that TRPA's actions represented a proportional response to a serious risk of harm to the lake, petitioners might have argued that the moratoria did not substantially advance a legitimate state interest, see *Agins* and *Monterey.* Finally, if petitioners had challenged the application of the moratoria to their individual parcels, instead of making a facial challenge, some of them might have prevailed under a *Penn Central* analysis. ·

As the case comes to us, however, none of the last four theories is available. The "rolling moratoria" theory was presented in the petition for certiorari, but our order granting review did not encompass that issue, 533 U. S. 948 (2001); the case was tried in the District Court and reviewed in the Court of Appeals on the theory that each of the two moratoria was a separate taking, one for a 2-year period and the other for an 8-month period. 216 F. 3d, at 769. And, as we have already noted, recovery on either a bad faith theory or a theory that the state interests were insubstantial is foreclosed by the District Court's unchallenged findings of fact. Recovery under a *Penn Central* analysis is also foreclosed both because petitioners expressly disavowed that theory, and because they did not appeal from the District Court's conclusion that the evidence would not support it. Nonetheless, each of the three *per se* theories is fairly encompassed within the question that we decided to answer.

With respect to these theories, the ultimate constitutional question is whether the concepts of "fairness and justice" that underlie the Takings Clause will be better served by one of these categorical rules or by a *Penn Central* inquiry into all of the relevant circumstances in particular cases. From that perspective, the extreme categorical rule that any deprivation of all economic use, no matter how brief, constitutes a compensable taking surely cannot be sustained. Petitioners' broad submission would apply to numerous

"normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like," 482 U. S., at 321, as well as to orders temporarily prohibiting access to crime scenes, businesses that violate health codes, fire-damaged buildings, or other areas that we cannot now foresee. . Such a rule would undoubtedly require changes in numerous practices that have long been considered permissible exercises of the police power. As Justice Holmes warned in *Mahon*, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." 260 U. S., at 413. A rule that required compensation for every delay in the use of property would render routine government processes prohibitively expensive or encourage hasty decisionmaking. Such an important change in the law should be the product of legislative rulemaking rather than adjudication.[30]

More importantly, for reasons set out at some length by JUSTICE O'CONNOR in her concurring opinion in *Palazzolo* v. *Rhode Island*, 533 U. S., at 636, we are persuaded that the better approach to claims that a regulation has effected a temporary taking "requires careful examination and weighing of all the relevant circumstances." In that opinion, JUSTICE O'CONNOR specifically considered the role that the "temporal relationship between regulatory enactment and title acquisition" should play in the analysis of a takings claim. *Id.,* at 632. We have no occasion to address that particular issue in this case, because it involves a differ-

---

[30] In addition, we recognize the anomaly that would be created if we were to apply *Penn Central* when a landowner is permanently deprived of 95% of the use of her property, *Lucas,* 505 U. S., at 1019, n. 8, and yet find a *per se* taking anytime the same property owner is deprived of all use for only five days. Such a scheme would present an odd inversion of Justice Holmes' adage: "A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." *Block* v. *Hirsh,* 256 U. S. 135, 157 (1921).

ent temporal relationship—the distinction between a temporary restriction and one that is permanent. Her comments on the "fairness and justice" inquiry are, nevertheless, instructive:

> "Today's holding does not mean that the timing of the regulation's enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis. Indeed, it would be just as much error to expunge this consideration from the takings inquiry as it would be to accord it exclusive significance. Our polestar instead remains the principles set forth in *Penn Central* itself and our other cases that govern partial regulatory takings. Under these cases, interference with investment-backed expectations is one of a number of factors that a court must examine. . . .
>
> "The Fifth Amendment forbids the taking of private property for public use without just compensation. We have recognized that this constitutional guarantee is '"designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."' *Penn Central*, [438 U. S.], at 123–124 (quoting *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960)). The concepts of 'fairness and justice' that underlie the Takings Clause, of course, are less than fully determinate. Accordingly, we have eschewed 'any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' *Penn Central, supra,* at 124 (quoting *Goldblatt* v. *Hempstead*, 369 U. S. 590, 594 (1962)). The outcome instead 'depends largely "upon the particular circumstances [in that] case."' *Penn Central, supra,* at 124 (quoting *United States* v. *Central Eureka Mining Co.*, 357 U. S. 155, 168 (1958))." *Id.,* at 633.

In rejecting petitioners' *per se* rule, we do not hold that the temporary nature of a land-use restriction precludes finding that it effects a taking; we simply recognize that it should not be given exclusive significance one way or the other.

A narrower rule that excluded the normal delays associated with processing permits, or that covered only delays of more than a year, would certainly have a less severe impact on prevailing practices, but it would still impose serious financial constraints on the planning process.[31]   Unlike the "extraordinary circumstance" in which the government deprives a property owner of all economic use, *Lucas*, 505 U. S., at 1017, moratoria like Ordinance 81–5 and Resolution 83–21 are used widely among land-use planners to preserve the status quo while formulating a more permanent development strategy.[32]   In fact, the consensus in the planning com-

---

[31] Petitioners fail to offer a persuasive explanation for why moratoria should be treated differently from ordinary permit delays.   They contend that a permit applicant need only comply with certain specific requirements in order to receive one and can expect to develop at the end of the process, whereas there is nothing the landowner subject to a moratorium can do but wait, with no guarantee that a permit will be granted at the end of the process.   Brief for Petitioners 28.   Setting aside the obvious problem with basing the distinction on a course of events we can only know after the fact—in the context of a facial challenge—petitioners' argument breaks down under closer examination because there is no guarantee that a permit will be granted, or that a decision will be made within a year.   See, *e. g., Dufau* v. *United States*, 22 Cl. Ct. 156 (1990) (holding that 16-month delay in granting a permit did not constitute a temporary taking).   Moreover, under petitioners' modified categorical rule, there would be no *per se* taking if TRPA simply delayed action on all permits pending a regional plan.   Fairness and justice do not require that TRPA be penalized for achieving the same result, but with full disclosure.

[32] See, *e. g., Santa Fe Village Venture* v. *Albuquerque*, 914 F. Supp. 478, 483 (N. M. 1995) (30-month moratorium on development of lands within the Petroglyph National Monument was not a taking); *Williams* v. *Central*, 907 P. 2d 701, 703–706 (Colo. App. 1995) (10-month moratorium on development in gaming district while studying city's ability to absorb growth was not a compensable taking); *Woodbury Place Partners* v. *Woodbury*, 492 N. W. 2d 258 (Minn. App. 1993) (moratorium pending review

munity appears to be that moratoria, or "interim development controls" as they are often called, are an essential tool of successful development.[33]   Yet even the weak version of petitioners' categorical rule would treat these interim measures as takings regardless of the good faith of the planners, the reasonable expectations of the landowners, or the actual impact of the moratorium on property values.[34]

of plan for land adjacent to interstate highway was not a taking even though it deprived property owner of all economically viable use of its property for two years); *Zilber* v. *Moranga*, 692 F. Supp. 1195 (ND Cal. 1988) (18-month development moratorium during completion of a comprehensive scheme for open space did not require compensation).   See also Wayman, Leaders Consider Options for Town Growth, Charlotte Observer, Feb. 3, 2002, p. 15M (describing 10-month building moratorium imposed "to give town leaders time to plan for development"); Wallman, City May Put Reins on Beach Projects, Sun-Sentinel, May 16, 2000, p. 1B (2-year building moratorium on beachfront property in Fort Lauderdale pending new height, width, and dispersal regulations); Foderaro, In Suburbs, They're Cracking Down on the Joneses, N. Y. Times, Mar. 19, 2001, p. A1 (describing moratorium imposed in Eastchester, New York, during a review of the town's zoning code to address the problem of oversized homes); Dawson, Commissioners recommend Aboite construction ban be lifted, Fort Wayne News Sentinel, May 4, 2001, p. 1A (3-year moratorium to allow improvements in the water and sewage treatment systems).

[33] See J. Juergensmeyer & T. Roberts, Land Use Planning and Control Law §§ 5.28(G) and 9.6 (1998); Garvin & Leitner, Drafting Interim Development Ordinances: Creating Time to Plan, 48 Land Use Law & Zoning Digest 3 (June 1996) ("With the planning so protected, there is no need for hasty adoption of permanent controls in order to avoid the establishment of nonconforming uses, or to respond in an ad hoc fashion to specific problems.   Instead, the planning and implementation process may be permitted to run its full and natural course with widespread citizen input and involvement, public debate, and full consideration of all issues and points of view"); Freilich, Interim Development Controls: Essential Tools for Implementing Flexible Planning and Zoning, 49 J. Urb. L. 65 (1971).

[34] THE CHIEF JUSTICE offers another alternative, suggesting that delays of six years or more should be treated as *per se* takings.   However, his dissent offers no explanation for why 6 years should be the cutoff point rather than 10 days, 10 months, or 10 years.   It is worth emphasizing that we do not reject a categorical rule in this case because a 32-month moratorium is just not that harsh.   Instead, we reject a categorical rule

The interest in facilitating informed decisionmaking by regulatory agencies counsels against adopting a *per se* rule that would impose such severe costs on their deliberations. Otherwise, the financial constraints of compensating property owners during a moratorium may force officials to rush through the planning process or to abandon the practice altogether. To the extent that communities are forced to abandon using moratoria, landowners will have incentives to develop their property quickly before a comprehensive plan can be enacted, thereby fostering inefficient and ill-conceived growth. A finding in the 1980 Compact itself, which presumably was endorsed by all three legislative bodies that participated in its enactment, attests to the importance of that concern. 94 Stat. 3243 ("The legislatures of the States of California and Nevada find that in order to make effective the regional plan as revised by the agency, it is necessary to halt temporarily works of development in the region which might otherwise absorb the entire capability of the region for further development or direct it out of harmony with the ultimate plan").

As JUSTICE KENNEDY explained in his opinion for the Court in *Palazzolo*, it is the interest in informed decisionmaking that underlies our decisions imposing a strict ripeness requirement on landowners asserting regulatory takings claims:

> "These cases stand for the important principle that a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation. Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable

---

because we conclude that the *Penn Central* framework adequately directs the inquiry to the proper considerations—only one of which is the length of the delay.

and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law. As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established. See *Suitum* [v. *Tahoe Regional Planning Agency*, 520 U. S. 725, 736, and n. 10 (1997)] (noting difficulty of demonstrating . that 'mere enactment' of regulations restricting land use effects a taking)." 533 U. S., at 620–621.

We would create a perverse system of incentives were we to hold that landowners must wait for a takings claim to ripen so that planners can make well-reasoned decisions while, at the same time, holding that those planners must compensate landowners for the delay.

Indeed, the interest in protecting the decisional process is even stronger when an agency is developing a regional plan than when it is considering a permit for a single parcel. In the proceedings involving the Lake Tahoe Basin, for example, the moratoria enabled TRPA to obtain the benefit of comments and criticisms from interested parties, such as the petitioners, during its deliberations.[35] Since a categorical rule tied to the length of deliberations would likely create added pressure on decisionmakers to reach a quick resolution of land-use questions, it would only serve to disadvantage those landowners and interest groups who are not as or-

---

[35] Petitioner Preservation Council, "through its authorized representatives, actively participated in the entire TRPA regional planning process leading to the adoption of the 1984 Regional Plan at issue in this action, and attended and expressed its views and concerns, orally and in writing, at each public hearing held by the Defendant TRPA in connection with the consideration of the 1984 Regional Plan at issue herein, as well as in connection with the adoption of Ordinance 81–5 and the Revised 1987 Regional Plan addressed herein." App. 24.

ganized or familiar with the planning process. Moreover, with a temporary ban on development there is a lesser risk that individual landowners will be "singled out" to bear a special burden that should be shared by the public as a whole. *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825, 835 (1987). At least with a moratorium there is a clear "reciprocity of advantage," *Mahon*, 260 U. S., at 415, because it protects the interests of all affected landowners against immediate construction that might be inconsistent with the provisions of the plan that is ultimately adopted. "While each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others." *Keystone*, 480 U. S., at 491. In fact, there is reason to believe property values often will continue to increase despite a moratorium. See, *e. g.*, *Growth Properties, Inc.* v. *Klingbeil Holding Co.*, 419 F. Supp. 212, 218 (Md. 1976) (noting that land values could be expected to increase 20% during a 5-year moratorium on development). Cf. *Forest Properties, Inc.* v. *United States*, 177 F. 3d 1360, 1367 (CA Fed. 1999) (record showed that market value of the entire parcel increased despite denial of permit to fill and develop lake-bottom property). Such an increase makes sense in this context because property values throughout the Basin can be expected to reflect the added assurance that Lake Tahoe will remain in its pristine state. Since in some cases a 1-year moratorium may not impose a burden at all, we should not adopt a rule that assumes moratoria always force individuals to bear a special burden that should be shared by the public as a whole.

It may well be true that any moratorium that lasts for more than one year should be viewed with special skepticism. But given the fact that the District Court found that the 32 months required by TRPA to formulate the 1984 Regional Plan was not unreasonable, we could not possibly conclude that every delay of over one year is constitutionally

unacceptable.[36]  Formulating a general rule of this kind is a suitable task for state legislatures.[37]  In our view, the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim, but with respect to that factor as with respect to other factors, the "temptation to adopt what amount to *per se* rules in either direction must be resisted."  *Palazzolo*, 533 U. S., at 636 (O'CONNOR, J., concurring).  There may be moratoria that last longer than one year which interfere with reasonable investment-backed expectations, but as the District Court's opinion illustrates, petitioners' proposed rule is simply "too blunt an instrument" for identifying those cases.  *Id.*, at 628.  We conclude, therefore, that the interest in "fairness and justice" will be best served by relying on the familiar *Penn Central* approach when deciding cases like this, rather than by attempting to craft a new categorical rule.

---

[36] We note that the temporary restriction that was ultimately upheld in the *First English* case lasted for more than six years before it was replaced by a permanent regulation.  *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 210 Cal. App. 3d 1353, 258 Cal. Rptr. 893 (1989).

[37] Several States already have statutes authorizing interim zoning ordinances with specific time limits.  See Cal. Govt. Code Ann. § 65858 (West Supp. 2002) (authorizing interim ordinance of up to two years); Colo. Rev. Stat. § 30–28–121 (2001) (six months); Ky. Rev. Stat. Ann. § 100.201 (2001) (one year); Mich. Comp. Laws Ann. § 125.215 (West 2001) (three years); Minn. Stat. § 394.34 (2000) (two years); N. H. Rev. Stat. Ann. § 674:23 (West 2001) (one year); Ore. Rev. Stat. Ann. § 197.520 (1997) (10 months); S. D. Codified Laws § 11–2–10 (2001) (two years); Utah Code Ann. § 17–27–404 (1995) (18 months); Wash. Rev. Code § 35.63.200 (2001); Wis. Stat. § 62.23(7)(d) (2001) (two years).  Other States, although without specific statutory authority, have recognized that reasonable interim zoning ordinances may be enacted.  See, *e. g., S. E. W. Freil* v. *Triangle Oil Co.,* 76 Md. App. 96, 543 A. 2d 863 (1988); *New Jersey Shore Builders Assn.* v. *Dover Twp. Comm.,* 191 N. J. Super. 627, 468 A. 2d 742 (1983); *SCA Chemical Waste Servs., Inc.* v. *Konigsberg,* 636 S. W. 2d 430 (Tenn. 1982); *Sturgess* v. *Chilmark,* 380 Mass. 246, 402 N. E. 2d 1346 (1980); *Lebanon* v. *Woods,* 153 Conn. 182, 215 A. 2d 112 (1965).

Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

For over half a decade petitioners were prohibited from building homes, or any other structures, on their land. Because the Takings Clause requires the government to pay compensation when it deprives owners of all economically viable use of their land, see *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003 (1992), and because a ban on all development lasting almost six years does not resemble any traditional land-use planning device, I dissent.

## I

"A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald, Sommer & Frates* v. *Yolo County,* 477 U. S. 340, 348 (1986) (citing *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922)).[1] In failing to undertake this inquiry, the Court

[1] We are not bound by the Court of Appeals' determination that petitioners' claim under 42 U. S. C. § 1983 (1994 ed., Supp. V) permitted only challenges to Ordinance 81-5 and Regulation 83-21. Petitioners sought certiorari on the Court of Appeals' ruling that respondent Tahoe Regional Planning Agency (hereinafter respondent) did not cause petitioners' injury from 1984 to 1987. Pet. for Cert. 27–30. We did not grant certiorari on any of the petition's specific questions presented, but formulated the following question: "Whether the Court of Appeals properly determined that a temporary moratorium on land development does not constitute a taking of property requiring compensation under the Takings Clause of the United States Constitution?" 533 U. S. 948–949 (2001). This Court's Rule 14(1)(a) provides that a "question presented is deemed to comprise every subsidiary question fairly included therein." The question of how long the moratorium on land development lasted is necessarily subsumed within the question whether the moratorium constituted a taking. Petitioners did not assume otherwise. Their brief on the merits argues that respondent "effectively blocked all construction for the past two decades." Brief for Petitioners 7.

ignores much of the impact of respondent's conduct on petitioners. Instead, it relies on the flawed determination of the Court of Appeals that the relevant time period lasted only from August 1981 until April 1984. *Ante*, at 312, 313–314. During that period, Ordinance 81–5 and Regulation 83–21 prohibited development pending the adoption of a new regional land-use plan. The adoption of the 1984 Regional Plan (hereinafter Plan or 1984 Plan) did not, however, change anything from petitioners' standpoint. After the adoption of the 1984 Plan, petitioners still could make no use of their land.

The Court of Appeals disregarded this post-April 1984 deprivation on the ground that respondent did not "cause" it. In a 42 U. S. C. § 1983 action, "the plaintiff must demonstrate that the defendant's conduct was the actionable cause of the claimed injury." 216 F. 3d 764, 783 (CA9 2000). Applying this principle, the Court of Appeals held that the 1984 Plan did not amount to a taking because the Plan actually allowed permits to issue for the construction of single-family residences. Those permits were never issued because the District Court immediately issued a temporary restraining order, and later a permanent injunction that lasted until 1987, prohibiting the approval of any building projects under the 1984 Plan. Thus, the Court of Appeals concluded that the "1984 Plan itself could not have. constituted a taking," because it was the injunction, not the Plan, that prohibited development during this period. *Id.*, at 784. The Court of Appeals is correct that the 1984 Plan did not cause petitioners' injury. But that is the right answer to the wrong question. The causation question is not limited to whether the 1984 Plan caused petitioners' injury; the question is whether respondent caused petitioners' injury.

We have never addressed the § 1983 causation requirement in the context of a regulatory takings claim, though language in *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), suggests that ordinary principles of proximate cause

govern the causation inquiry for takings claims. *Id.*, at 124. The causation standard does not require much elaboration in this case, because respondent was undoubtedly the "moving force" behind petitioners' inability to build on their land from August 1984 through 1987. *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 694 (1978) (§ 1983 causation established when government action is the "moving force" behind the alleged constitutional violation). The injunction in this case issued because the 1984 Plan did not comply with the 1980 Tahoe Regional Planning Compact (Compact) and regulations issued pursuant to the Compact. And, of course, respondent is responsible for the Compact and its regulations.

On August 26, 1982, respondent adopted Resolution 82–11. That resolution established "environmental thresholds for water quality, soil conservation, air quality, vegetation preservation, wildlife, fisheries, noise, recreation, and scenic resources." *California* v. *Tahoe Regional Planning Agency*, 766 F. 2d 1308, 1311 (CA9 1985). The District Court enjoined the 1984 Plan in part because the Plan would have allowed 42,000 metric tons of soil per year to erode from some of the single-family residences, in excess of the Resolution 82–11 threshold for soil conservation. *Id.*, at 1315; see also *id.*, at 1312. Another reason the District Court enjoined the 1984 Plan was that it did not comply with article V(g) of the Compact, which requires a finding, "with respect to each project, that the project will not cause the established [environmental] thresholds to be exceeded." *Ibid.* Thus, the District Court enjoined the 1984 Plan because the Plan did not comply with the environmental requirements of respondent's regulations and of the Compact itself.

Respondent is surely responsible for its own regulations, and it is also responsible for the Compact as it is the governmental agency charged with administering the Compact. Compact, Art. I(c), 94 Stat. 3234. It follows that respondent was the "moving force" behind petitioners' inability to de-

velop their land from April 1984 through the enactment of the 1987 plan. Without the environmental thresholds established by the Compact and Resolution 82–11, the 1984 Plan would have gone into effect and petitioners would have been able to build single-family residences. And it was certainly foreseeable that development projects exceeding the environmental thresholds would be prohibited; indeed, that was the very purpose of enacting the thresholds.

Because respondent caused petitioners' inability to use their land from 1981 through 1987, that is the appropriate period of time from which to consider their takings claim.

## II

I now turn to determining whether a ban on all economic development lasting almost six years is a taking. *Lucas* reaffirmed our "frequently expressed" view that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." 505 U. S., at 1019. See also *Agins* v. *City of Tiburon*, 447 U. S. 255, 258–259 (1980). The District Court in this case held that the ordinances and resolutions in effect between August 24, 1981, and April 25, 1984, "did in fact deny the plaintiffs all economically viable use of their land." 34 F. Supp. 2d 1226, 1245 (Nev. 1999). The Court of Appeals did not overturn this finding. And the 1984 injunction, issued because the environmental thresholds issued by respondent did not permit the development of single-family residences, forced petitioners to leave their land economically idle for at least another three years. The Court does not dispute that petitioners were forced to leave their land economically idle during this period. See *ante*, at 312. But the Court refuses to apply *Lucas* on the ground that the deprivation was "temporary."

Neither the Takings Clause nor our case law supports such a distinction. For one thing, a distinction between

"temporary" and "permanent" prohibitions is tenuous. The "temporary" prohibition in this case that the Court finds is not a taking lasted almost six years.[2] The "permanent" prohibition that the Court held to be a taking in *Lucas* lasted less than two years. See 505 U. S., at 1011–1012. The "permanent" prohibition in *Lucas* lasted less than two years because the law, as it often does, changed. The South Carolina Legislature in 1990 decided to amend the 1988 Beachfront Management Act to allow the issuance of " 'special permits' for the construction or reconstruction of habitable structures seaward of the baseline." *Id.*, at 1011–1012. Land-use regulations are not irrevocable. And the government can even abandon condemned land. See *United States* v. *Dow*, 357 U. S. 17, 26 (1958). Under the Court's decision today, the takings question turns entirely on the initial label given a regulation, a label that is often without much meaning. There is every incentive for government to simply label any prohibition on development "temporary," or to fix a set number of years. As in this case, this initial designation does not preclude the government from repeatedly extending the "temporary" prohibition into a long-term ban on all development. The Court now holds that such a designation by the government is conclusive even though in fact the moratorium greatly exceeds the time initially specified. Apparently, the Court would not view even a 10-year moratorium as a taking under *Lucas* because the moratorium is not "permanent."

Our opinion in *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304 (1987), rejects any distinction between temporary and permanent takings when a landowner is deprived of all economically beneficial use of his land. *First English* stated that " 'temporary takings which, as here, deny a landowner all use of his property, are not different in kind from permanent

---

[2] Even under the Court's mistaken view that the ban on development lasted only 32 months, the ban in this case exceeded the ban in *Lucas*.

takings, for which the Constitution clearly requires compensation." *Id.*, at 318. Because of *First English*'s rule that "temporary deprivations of use are compensable under the Takings Clause," the Court in *Lucas* found nothing problematic about the later developments that potentially made the ban on development temporary. 505 U. S., at 1011–1012 (citing *First English, supra*); see also 505 U. S., at 1033 (KENNEDY, J., concurring in judgment) ("It is well established that temporary takings are as protected by the Constitution as are permanent ones" (citing *First English, supra*, at 318)).

More fundamentally, even if a practical distinction between temporary and permanent deprivations were plausible, to treat the two differently in terms of takings law would be at odds with the justification for the *Lucas* rule. The *Lucas* rule is derived from the fact that a "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." 505 U. S., at 1017. The regulation in *Lucas* was the "practical equivalence" of a long-term physical appropriation, *i. e.*, a condemnation, so the Fifth Amendment required compensation. The "practical equivalence," from the landowner's point of view, of a "temporary" ban on all economic use is a forced leasehold. For example, assume the following situation: Respondent is contemplating the creation of a National Park around Lake Tahoe to preserve its scenic beauty. Respondent decides to take a 6-year leasehold over petitioners' property, during which any human activity on the land would be prohibited, in order to prevent any further destruction to the area while it was deciding whether to request that the area be designated a National Park.

Surely that leasehold would require compensation. In a series of World War II-era cases in which the Government had condemned leasehold interests in order to support the war effort, the Government conceded that it was required

to pay compensation for the leasehold interest.[3]  See *United States* v. *Petty Motor Co.*, 327 U. S. 372 (1946); *United States* v. *General Motors Corp.*, 323 U. S. 373, 376 (1945).  From petitioners' standpoint, what happened in this case is no different than if the government had taken a 6-year lease of their property.  The Court ignores this "practical equivalence" between respondent's deprivation and the deprivation resulting from a leasehold.  In so doing, the Court allows the government to "do by regulation what it cannot do through eminent domain—i. e., take private property without paying for it."  228 F. 3d 998, 999 (CA9 2000) (Kozinski, J., dissenting from denial of rehearing en banc).

Instead of acknowledging the "practical equivalence" of this case and a condemned leasehold, the Court analogizes to other areas of takings law in which we have distinguished between regulations and physical appropriations, see *ante*, at 321–324.  But whatever basis there is for such distinctions in those contexts does not apply when a regulation deprives a landowner of all economically beneficial use of his land.  In addition to the "practical equivalence" from the landowner's perspective of such a regulation and a physical appropriation, we have held that a regulation denying all productive use of land does not implicate the traditional justification for differentiating between regulations and physical appropriations.  In "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted," it is less likely that "the legislature is simply

---

[3] There was no dispute that just compensation was required in those cases.  The disagreement involved how to calculate that compensation. In *United States* v. *General Motors Corp.*, 323 U. S. 373 (1945), for example, the issues before the Court were how to value the leasehold interest (*i. e.*, whether the "long-term rental value [should be] the sole measure of the value of such short-term occupancy," *id.*, at 380), whether the Government had to pay for the respondent's removal of personal property from the condemned warehouse, and whether the Government had to pay for the reduction in value of the respondent's equipment and fixtures left in the warehouse.  *Id.*, at 380–381.

'adjusting the benefits and burdens of economic life' . . . in a manner that secures an 'average reciprocity of advantage' to everyone concerned," *Lucas, supra,* at 1017–1018 (quoting *Penn Central Transp. Co.* v. *New York City,* 438 U. S., at 124, and *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S., at 415), and more likely that the property "is being pressed into some form of public service under the guise of mitigating serious public harm," *Lucas, supra,* at 1018.

The Court also reads *Lucas* as being fundamentally concerned with value, *ante,* at 329–331, rather than with the denial of "all economically beneficial or productive use of land," 505 U. S., at 1015. But *Lucas* repeatedly discusses its holding as applying where "*no* productive or economically beneficial use of land is permitted." *Id.,* at 1017; see also *ibid.* ("[T]otal deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation"); *id.,* at 1016 ("[T]he Fifth Amendment is violated when land-use regulation . . . *denies an owner economically viable use of his land");* *id.,* at 1018 ("[T]he *functional* basis for permitting the government, by regulation, to affect property values without compensation . . . does not apply to the relatively rare situations where the government has deprived a landowner of all economically beneficial uses"); *ibid.* ("[T]he fact that regulations that leave the owner of land without economically beneficial or productive options for its use . . . carry with them a heightened risk that private property is being pressed into some form of public service"); *id.,* at 1019 ("[W]hen the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking"). Moreover, the Court's position that value is the *sine qua non* of the *Lucas* rule proves too much. Surely, the land at issue in *Lucas* retained some market value based on the contingency, which soon came to fruition (see *supra,* at 347), that the development ban would be amended.

*Lucas* is implicated when the government deprives a landowner of "all economically beneficial or productive use of land." 505 U. S., at 1015. The District Court found, and the Court agrees, that the moratorium "temporarily" deprived petitioners of " 'all economically viable use of their land.' " *Ante,* at 316. Because the rationale for the *Lucas* rule applies just as strongly in this case, the "temporary" denial of all viable use of land for six years is a taking.

### III

The Court worries that applying *Lucas* here compels finding that an array of traditional, short-term, land-use planning devices are takings. *Ante,* at 334–335, 337–338. But since the beginning of our regulatory takings jurisprudence, we have recognized that property rights "are enjoyed under an implied limitation." *Mahon, supra,* at 413. Thus, in *Lucas,* after holding that the regulation prohibiting all economically beneficial use of the coastal land came within our categorical takings rule, we nonetheless inquired into whether such a result "inhere[d] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." 505 U. S., at 1029. Because the regulation at issue in *Lucas* purported to be permanent, or at least long term, we concluded that the only implied limitation of state property law that could achieve a similar long-term deprivation of all economic use would be something "achieved in the courts—by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." *Ibid.*

When a regulation merely delays a final land-use decision, we have recognized that there are other background principles of state property law that prevent the delay from being deemed a taking. We thus noted in *First English* that our discussion of temporary takings did not apply "in the case

of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like." 482 U. S., at 321. We reiterated this last Term: "The right to improve property, of course, is subject to the reasonable exercise of state authority, including the enforcement of valid zoning and land-use restrictions." *Palazzolo* v. *Rhode Island,* 533 U. S. 606, 627 (2001). Zoning regulations existed as far back as colonial Boston, see Treanor, The Original Understanding of the Takings Clause and the Political Process, 95 Colum. L. Rev. 782, 789 (1995), and New York City enacted the first comprehensive zoning ordinance in 1916, see 1 Anderson's American Law of Zoning § 3.07, p. 92 (K. Young rev. 4th ed. 1995). Thus, the short-term delays attendant to zoning and permit regimes are a longstanding feature of state property law and part of a landowner's reasonable investment-backed expectations. See *Lucas, supra,* at 1034 (KENNEDY, J., concurring in judgment).

But a moratorium prohibiting all economic use for a period of six years is not one of the longstanding, implied limitations of state property law.[4] Moratoria are "interim controls on the use of land that seek to maintain the status quo with respect to land development in an area by either 'freezing' existing land uses or by allowing the issuance of building permits for only certain land uses that would not be inconsistent with a contemplated zoning plan or zoning change." 1 E. Ziegler, Rathkopf's The Law of Zoning and

---

[4] Six years is not a "cutoff point," *ante,* at 338, n. 34; it is the length involved in this case. And the "explanation" for the conclusion that there is a taking in this case is the fact that a 6-year moratorium far exceeds any moratorium authorized under background principles of state property law. See *infra,* at 353–354. This case does not require us to undertake a more exacting study of state property law and discern exactly how long a moratorium must last before it no longer can be considered an implied limitation of property ownership (assuming, that is, that a moratorium on all development is a background principle of state property law, see *infra,* at 353).

Planning § 13:3, p. 13–6 (4th ed. 2001). Typical moratoria thus prohibit only certain categories of development, such as fast-food restaurants, see *Schafer* v. *New Orleans,* 743 F. 2d 1086 (CA5 1984), or adult businesses, see *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986), or all commercial development, see *Arnold Bernhard & Co.* v. *Planning & Zoning Comm'n,* 194 Conn. 152, 479 A. 2d 801 (1984). Such moratoria do not implicate *Lucas* because they do not deprive landowners of all economically beneficial use of their land. As for moratoria that prohibit all development, these do not have the lineage of permit and zoning requirements and thus it is less certain that property is acquired under the "implied limitation" of a moratorium prohibiting all development. Moreover, unlike a permit system in which it is expected that a project will be approved so long as certain conditions are satisfied, a moratorium that prohibits all uses is by definition contemplating a new land-use plan that would prohibit all uses.

But this case does not require us to decide as a categorical matter whether moratoria prohibiting all economic use are an implied limitation of state property law, because the duration of this "moratorium" far exceeds that of ordinary moratoria. As the Court recognizes, *ante,* at 342, n. 37, state statutes authorizing the issuance of moratoria often limit the moratoria's duration. California, where much of the land at issue in this case is located, provides that a moratorium "shall be of no further force and effect 45 days from its date of adoption," and caps extension of the moratorium so that the total duration cannot exceed two years. Cal. Govt. Code Ann. § 65858(a) (West Supp. 2002); see also Minn. Stat. § 462.355, subd. 4 (2000) (limiting moratoria to 18 months, with one permissible extension, for a total of two years). Another State limits moratoria to 120 days, with the possibility of a single 6-month extension. Ore. Rev. Stat. Ann. § 197.520(4) (1997). Others limit moratoria to six

months without any possibility of an extension. See Colo. Rev. Stat. § 30–28–121 (2001); N. J. Stat. Ann. § 40:55D–90(b) (1991).[5]  Indeed, it has long been understood that moratoria on development exceeding these short time periods are not a legitimate planning device. See, *e. g., Holdsworth* v. *Hague,* 9 N. J. Misc. 715, 155 A. 892 (1931).

Resolution 83–21 reflected this understanding of the limited duration of moratoria in initially limiting the moratorium in this case to 90 days.  But what resulted—a "moratorium" lasting nearly six years—bears no resemblance to the short-term nature of traditional moratoria as understood from these background examples of state property law.

Because the prohibition on development of nearly six years in this case cannot be said to resemble any "implied limitation" of state property law, it is a taking that requires compensation.

\*     \*     \*

Lake Tahoe is a national treasure, and I do not doubt that respondent's efforts at preventing further degradation of the lake were made in good faith in furtherance of the public interest.  But, as is the case with most governmental action that furthers the public interest, the Constitution requires that the costs and burdens be borne by the public at large, not by a few targeted citizens.  Justice Holmes' admonition of 80 years ago again rings true: "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Mahon,* 260 U. S., at 416.

---

[5] These are just some examples of the state laws limiting the duration of moratoria.  There are others.  See, *e. g.,* Utah Code Ann. §§ 17–27–404(3)(b)(i)–(ii) (1995) (temporary prohibitions on development "may not exceed six months in duration," with the possibility of extensions for no more than "two additional six-month periods").  See also *ante,* at 337, n. 31.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

I join THE CHIEF JUSTICE's dissent. I write separately to address the majority's conclusion that the temporary moratorium at issue here was not a taking because it was not a "taking of 'the parcel as a whole.'" *Ante*, at 332. While this questionable rule* has been applied to various alleged regulatory takings, it was, in my view, rejected in the context of *temporal* deprivations of property by *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 318 (1987), which held that temporary and permanent takings "are not different in kind" when a landowner is deprived of all beneficial use of his land. I had thought that *First English* put to rest the notion that the "relevant denominator" is land's infinite life. Consequently,. a regulation effecting a total deprivation of the use of a so-called "temporal slice" of property is compensable under the Takings Clause unless background principles of state property law prevent it from being deemed a taking; "total deprivation of use is, from the landowner's point of view, the equivalent of a physical appropriation." *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1017 (1992).

A taking is exactly what occurred in this case. No one seriously doubts that the land-use regulations at issue rendered petitioners' land unsusceptible of *any* economically beneficial use. This was true at the inception of the mora-

---

*The majority's decision to embrace the "parcel as a whole" doctrine as *settled* is puzzling. See, *e. g., Palazzolo* v. *Rhode Island,* 533 U. S. 606, 631 (2001) (noting that the Court has "at times expressed discomfort with the logic of [the parcel as a whole] rule"); *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003, 1017, n. 7 (1992) (recognizing that "uncertainty regarding the composition of the denominator in [the Court's] 'deprivation' fraction has produced inconsistent pronouncements by the Court," and that the relevant calculus is a "difficult question").

torium, and it remains true today. These individuals and families were deprived of the opportunity to build single-family homes as permanent, retirement, or vacation residences on land upon which such construction was authorized when purchased. The Court assures them that "a temporary prohibition on economic use" cannot be a taking because "[l]ogically . . . the property will recover value as soon as the prohibition is lifted." *Ante,* at 332. But the "logical" assurance that a "temporary restriction . . . merely causes a diminution in value," *ibid.,* is cold comfort to the property owners in this case or any other. After all, *"[i]n the long run* .we are all dead." J. Keynes, Monetary Reform 88 (1924).

I would hold that regulations prohibiting all productive uses of property are subject to *Lucas' per se* rule, regardless of whether the property so burdened retains theoretical useful life and value if, and when, the "temporary" moratorium is lifted. To my mind, such potential future value bears on the amount of compensation due and has nothing to do with the question whether there was a taking in the first place. It is regrettable that the Court has charted a markedly different path today.