# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-01001-SCT

*WARD GULFPORT PROPERTIES, L.P., AND T.*
*JERARD GULFPORT, LLC*

*v.*

*MISSISSIPPI STATE HIGHWAY COMMISSION*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/18/2014 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS, JR. |
| TRIAL COURT ATTORNEYS: | SHELDON G. ALSTON |
| | CHRISTOPHER M. HOWDESHELL |
| | JACK HOMER PITTMAN |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | SHELDON G. ALSTON |
| | KAREN ELIZABETH HOWELL |
| | PAUL J. MAYRONNE |
| ATTORNEYS FOR APPELLEE: | CHRISTOPHER M. HOWDESHELL |
| | JACK HOMER PITTMAN |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 10/22/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., LAMAR AND KITCHENS, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     When the Mississippi State Highway Commission (MHC) sought a permit from the

Army Corps of Engineers (ACE) to fill wetlands in the roadbed of a proposed limited-access

road, it pledged approximately 1,300 acres of Ward Gulfport Properties, L.P.'s and T. Jerard

Gulfport, L.L.C.'s ("Ward," collectively) property as wetlands mitigation. ACE issued the

permit to MHC in 2009. Ward filed suit in state court against MHC, seeking damages from an unlawful taking, and in federal court against ACE, seeking to have the permit invalidated. The federal court vacated the permit. MHC moved for summary judgment, arguing that no taking had occurred and that the federal court had determined ACE, not MHC, had caused Ward's losses. The trial court granted MHC's motion. Ward appealed. Finding the trial court erred in granting summary judgment in favor of MHC, we reverse and remand.

## STATEMENT OF THE FACTS AND PROCEEDINGS BELOW

¶2.     In 2007, MHC applied for a permit with ACE to fill wetlands in the roadbed of a proposed connector road in the Turkey Creek Watershed near Gulfport. MHC planned to use wetland mitigation bank credits to offset the loss of wetland in the roadbed, but the Mississippi Department of Environmental Quality (MDEQ), ACE, and the Environmental Protection Agency (EPA) took issue with that suggestion. After meeting with those agencies at the site in February 2009, MHC suggesting using approximately 1,300 acres of Ward's property as mitigation property. On MHC's pledge of Ward's 1,300 acres, ACE issued the permit in August 2009. The permit required that all 1,638 acres (approximately 1,300 belonging to Ward) be acquired or under contract prior to the road being opened for traffic.[1]

¶3.     Before issuance of the permit, Ward had a pending wetlands permit with ACE concerning potential development of part of the property and "significant negotiations with multiple potential buyers of portions of the property including William Carey College[2] and

---

[1]Ward was not involved in any of these meetings or discussions prior to the permit being issued.

[2]Now named William Carey University.

2

Sembler Atlanta, Inc. After issuance of the permit, "significant communication with potential purchasers" other than MHC ceased.[3] Also after issuance of the permit, Ward sought a water quality permit from MDEQ for development of the property, but it was denied.

¶4. Ward filed this suit seeking an injunction and/or damages for MHC's alleged taking and inverse condemnation in October 2009. The trial court granted MHC's motion to dismiss the injunctive-relief count.[4] In May 2011, MHC filed a motion for summary judgment, arguing Ward could not establish deprivation of a constitutionally cognizable property interest constituting a compensable taking. MHC further argued any damages were the result of ACE's and/or the EPA's conduct rather than MHC's. Ward responded that the permit constituted a categorical taking or, alternatively, a partial regulatory taking. It further argued MHC had requested the permit, including its specific requirements regarding mitigation, and had suggested using Ward's property, thereby causing the taking. MHC's motion was heard and taken under advisement in June 2011.

¶5. While pursuing its state-law claims, Ward filed suit in U.S. district court against ACE, asserting that ACE had acted arbitrarily and capriciously in issuing the permit—violating the National Environmental Policy Act of 1969, EPA Guidelines, and the Clean Water Act.[5] In November 2012, the federal court vacated and set aside the permit. ACE had argued Ward

---

[3]Upon pledging Ward's property, MHC began eminent domain proceedings to acquire the property but dropped pursuit when the permit was invalidated.

[4]The dismissal of the injunctive-relief claim is not part of this appeal.

[5]MHC was not named as a party in the federal suit, and ACE was not named as a party in the state suit.

lacked standing because its injuries were not traceable to any action by ACE. In addressing standing, the court stated:

> The Corps' Permit allows the filling of 162 acres of wetlands in the Turkey Creek Watershed, while requiring [MHC] to "mitigate by obtaining approximately 1,637.9 acres within the Turkey Creek Watershed, as noted in the attached drawings." . . . This requirement was apparently imposed at the request of the EPA. Much of the affected acreage is owed by Ward Properties. The Corps' requirements exercised sufficient coercive force over [MHC] to satisfy the causation element of standing.

The court did not address and made no findings regarding MHC's role in applying for and obtaining the permit.

¶6. After the federal court ruling, Ward amended its complaint in this state action to seek damages from the date the permit was issued (August 28, 2009) until the date it was vacated (November 21, 2012). MHC then filed a supplemental motion for summary judgment, which was taken under advisement. MHC filed a second supplemental motion for summary judgment arguing that (1) based on the federal ruling, ACE had caused Ward's alleged damages rather than MHC and (2) a temporary moratorium on development is not a basis for claiming damages. Ward responded that MHC's conduct was not before the federal court and that the federal court's focus was on ACE's conduct.

¶7. The trial court ruled in favor of MHC, finding that Ward had failed to show a taking occurred under a regulatory takings analysis and that the causation element had been resolved in federal court in favor of MHC, and dismissed the case. Ward appealed.

**STANDARD OF REVIEW**

4

¶8. This Court applies a *de novo* standard of review to a circuit court's grant or denial of summary judgment. ***Indem. Ins. Co. of N. Am. v. Guidant Mut. Ins. Co.***, 99 So. 3d 142, 149 (Miss. 2012). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). In order to survive summary judgment, Ward must show there is a genuine issue of material fact as to (1) the taking of a legally recognized property interest; (2) that MHC's actions caused such a taking; and (3) that such taking resulted in a diminution in value to the property. *See **Progressive Cas. Ins. Co. v. Allcare, Inc.***, 914 So. 2d 214, 221 (Miss. 2005). This Court views the evidence "in the light most favorable to the party against whom the motion has been made." ***Daniels v. GNB, Inc.***, 629 So. 2d 595, 599 (Miss. 1993).

## ISSUES

¶9. Ward raises the following issues relating to the trial court's grant of MHC's motion for summary judgment:

    **I.**      **Whether Ward's claims against MHC are barred by application of either *res judicata* or collateral estoppel.**

    **II.**     **Whether the trial court erred in finding no cognizable taking (either categorical or partial regulatory) took place.**

## ANALYSIS

5

**I.     Whether Ward's claims against MHC are barred by application of either *res judicata*[6] or collateral estoppel.[7]**

*A. Ward's claims are not barred by* res judicata.

¶10.    In Mississippi, *res judicata* will bar a claim if four identities are present and the same in both cases: "(1) identity of the subject matter of the action; (2) identity of the cause of action; (3) identity of the parties to the cause of action; and (4) identity of the quality or character of a person against whom a claim is made." ***Channel v. Loyacono***, 954 So. 2d 415, 424 (Miss. 2007) (quoting ***Harrison v. Chandler-Sampson Ins. Inc.***, 891 So. 2d 224, 232 (Miss. 2005)). The absence of any one of the listed identities "is fatal to the defense of *res judicata*." ***Id.***

¶11.    The identity of the parties is the same and is not in dispute because MHC and ACE were in privity, both having signed the permit; nor is it disputed that MHC and ACE share the same quality or character, both being governmental entities. The trial court further held, and MHC argues, (1) that the subject matter of both litigations was the permit and (2) that the cause of action was the same because both suits involved the circumstances surrounding the permit and its legal effects.

¶12.    However, such a narrow interpretation of these identities "would not be in keeping with the purpose for the res judicata doctrine," which is "the prevention of 'claim-splitting.'" ***Channel***, 891 So. 2d at 424-25. In ***Channel***, plaintiffs sued a pharmaceutical company, then later sued their attorney for malpractice related to the settlement agreement. ***Id.*** The Court

---

[6]This is increasingly referred to in legal parlance as "claim preclusion."

[7]This is increasingly referred to in legal parlance as "issue preclusion."

6

held that, while the cause of action in the malpractice case "did arise out of the same body of operative fact as the motions filed in the [pharmaceutical case]," the plaintiffs did not split a claim. *Id.* at 425. They filed an action against the company and filed a separate action against the attorneys.[8] In the language of the ***Channel*** Court, "To allow this suit would not subject [MHC], who [was] not [a] defendant[] in the previous case[], to repetitious or unnecessary litigation; and therefore, the requirement of identity of the cause of action is not met." *See id.* We find this identity lacking and Ward's claims not barred by *res judicata*.

¶13.     While our *res judicata* analysis could end here, we will complete it by addressing the final identity. This Court has defined "subject matter" as the "substance of the law suit." ***Hill v. Carroll Cty.***, 17 So. 3d 1081, 1085 (Miss. 2009) (citing ***Harrison***, 891 So. 2d at 232-33). The subject matter is not the same in these two cases. The subject matter before the federal court was whether ACE had violated specific federal acts in issuing the permit. The district court considered the obligations placed on ACE by those acts and ACE's responsibility for any action it took contrary to those obligations. The subject matter in this state case is whether MHC's actions in seeking the permit effected a cognizable taking. MHC's actions were not before the district court, nor are ACE's violations before this court. The subject matter in the two cases is not the same. *See **Pursue Energy Corp. v. Abernathy***, 77 So. 3d 1094, 1100 (Miss. 2011) ("Simply put, the issue is not the same in these two cases. In [the previous case], the issue was whether an oil and gas lessee could recover capital costs from

_____

[8]The Court described claim-splitting as if the plaintiffs had filed an action for negligence against the attorney and then filed an action for fraud against the attorney. *Id.*

7

royalty owners. In the present case, the question is whether the same cost can be twice recovered."). We find this identity lacking and Ward's claims not barred by *res judicata*.

*B. Ward's claims are not barred by collateral estoppel.*

¶14.    Collateral estoppel bars a party from relitigating specific issues or facts that have already been litigated in a former action when those issues or facts were actually determined as essential to the judgment in the former action, even where the later action proceeds on a different basis or in a different jurisdiction. *See **Riley v. Moreland***, 537 So. 2d 1348, 1354 (Miss. 1989); ***Wong v. Stripling***, 700 So. 2d 296, 302 (Miss. 1997).

¶15.    In the federal case, Ward sued ACE, claiming ACE had violated federal acts and procedures when it issued the permit. When ACE challenged Ward's standing to bring suit, the federal court had to analyze whether Ward had suffered "an injury in fact" that was "fairly traceable to the challenged action of [ACE], and not the result of independent action of some third party not before the court." (citing ***Lujan v. Defenders of Wildlife***, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). Regarding causation in a standing analysis, "the relevant inquiry . . . is whether the [government agency] has the ability through various programs to affect the [] decisions of those third part[ies] to such an extent that the plaintiff's injury could be relieved." ***Sierra Club v. Glickman***, 156 F.3d 606, 614 (5th Cir. 1998). The district court found Ward's property was directly affected by ACE's actions in issuing the permit and that, because the permit required MHC to mitigate by obtaining Ward's property as a necessary predicate to MHC's construction project, "[ACE]'s

8

requirements exercised sufficient coercive force over [MHC] to satisfy the causation element of standing."

¶16.    MHC argues the district court decided ACE alone had caused all of Ward's injuries. This argument mischaracterizes the judge's ruling. ACE was the sole party before the court, which was asked to decide whether ACE had violated federal laws in issuing the permit. The court determined (1) ACE violated those acts; (2) ACE issued the permit requested by MHC, which required MHC to acquire Ward's property before beginning its construction project; (3) Ward was harmed by ACE's issuance of the permit; and (4) the court could redress Ward's injury by invalidating the permit. Nowhere it its ruling did the court determine MHC was without fault. The only time the court addressed MHC's actions was when it determined that Ward's injuries were not wholly the result of an independent third party; the question was whether Ward's injuries could be fairly traceable to ACE's actions.

¶17.    The causation issue decided by the district court was whether ACE had violated the federal acts in issuing the permit so that the federal court could invalidate the permit. The causation issue in this state action is whether MHC's actions in applying for the permit and pledging Ward's property as wetlands mitigation effectuated a taking without just compensation. Any alleged wrongdoing by MHC was not necessary to the resolution of the federal case unless ACE could show the harm caused to Ward was wholly the result of independent action, just as ACE's actions are not necessary to the resolution of this case. We find Ward's claims not barred by collateral estoppel because the causation issues in the two cases are sufficiently distinct.

**II.    Whether the trial court erred in finding no cognizable taking took place.**

¶18.    *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922), established the standard to evaluate takings resulting from regulatory actions as opposed to eminent domain or physical invasions: "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

¶19.    In *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978), the Supreme Court elaborated on how far is "too far." In that case, Grand Central Station's owners sought compensation when Grand Central Station's designation as a New York City landmark prevented them from constructing a building over Grand Central Station. *Id.* at 109-15, 129-30. The Court developed a balancing test that weighed "the character of the government action, "the economic impact of the regulation on the claimant, and particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Id.* at 124-25. The Court found the impact of the law prevented the owners from using their parcel in a way they planned to at some unspecified point in the future, but the existing economic use of the property was allowed to continue. *Id.* at 136. Balancing these factors, including the fact the city had denied only the owners' specific plans and not all future development, the Court found there was no taking. *Id.* at 137-38.

¶20.    "The . . . issue left open in *Penn Central*—whether its balancing test is applicable to all regulations regardless of the degree of harm the regulation caused—was answered in the

10

negative in ***Lucas v. South Carolina Coastal Council***, 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992)." ***Resource Inv., Inc. v. United States***, 85 Fed. Cl. 447, 474 (2009). The ***Lucas*** Court held that "if a regulation works a complete 'wipe out' of economic value, the balancing factors do not apply, because the regulation is a *per se* taking (also called a 'categorical' taking), because it is functionally equivalent to a taking caused by physical destruction or eminent domain." ***Id.*** (citing ***Lucas***, 505 U.S. at 1016-18).

¶21.    ***Lucas*** concerned a landowner's facial challenge to a South Carolina law prohibiting construction of "occupiable improvements" along the waterfront. ***Id.*** at 1009. After Lucas filed suit, the law "was amended to authorize the Council . . . to issue 'special permits' for construction . . . of habitable structures" within the previously prohibited area. ***Id.*** at 1010-11. By cutting short the total ban on development, the law as amended meant that "Lucas [might] yet [have been] able to secure permission to build on his property." ***Id.*** at 1011. Still, the Court found there had been a categorical taking because, for the period between the law's passage and its amendment, Lucas was prohibited from making economically viable use of his property. ***Id.*** at 1012.

¶22.    The trial court likened this case to ***Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency***, 535 U.S. 302, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002). However, the regulation at issue in ***Tahoe-Sierra*** expressly specified it was only a "temporary moratorium" on development. ***Id.*** It was not a permanent regulation cut short. *See id.* at 320-21. It consisted of two moratoria "to maintain the status quo while studying the impact of development on Lake Tahoe and designing a strategy for environmentally sound

growth," which prevented all construction on certain lands for thirty-two months. *Id.* at 306, 312. The Supreme Court rejected the idea that the mere enactment of the moratoria effected a categorical taking, holding that the ***Penn Central*** factors apply to cases involving prospectively temporary rather than prospectively permanent measures. *Id.* at 329, 342. Whereas the regulation at issue in ***Lucas*** stated the ban on development "was unconditional and permanent," the Court found it dispositive that the regulations at issue in ***Tahoe-Sierra*** were merely temporary measures, which specifically stated they would terminate. *Id.* at 329. Although the regulations in ***Tahoe-Sierra*** did not specify the date of their expiration, they were expressly temporary when enacted. ***Resource Inv.***, 85 Fed. Cl. at 480 (citing ***Tahoe-Sierra***, 535 U.S. at 311). "Thus, at the moment the moratorium took effect, it effected a taking of property values for a finite and limited segment of time rather than permanently and indefinitely." *Id.* at 481.

¶23.    In contrast, the act at issue in ***Lucas*** was not temporary at the time it was enacted, "[n]or was there even a *hypothetical* point at which the parcels' future use interests would spring back into existence." *Id.* (citing ***Lucas***, 505 U.S. at 1012). A prospectively permanent restriction on economically viable use constituted a taking of the parcel as a temporal whole, regardless of the interests that reverted to the landowner upon the act's subsequent amendment. *Id.* (citing ***Lucas***, 505 U.S. at 1012; ***Tahoe-Sierra***, 535 U.S. at 329-30).

*A. The trial court erred in failing to analyze whether a categorical taking took place.*

¶24.    In its Findings of Fact and Conclusions of Law, the trial court stated that "Plaintiffs herein allege that the Permit resulted in a temporary moratorium on development" and later

referenced "the allegedly temporary restriction." The court then summarily stated, "Since it is undisputed that [MHC] never used or occupied the property in question, then [Ward]'s claim is properly categorized as a regulatory takings claim and should be analyzed as provided by the United States Supreme Court in *Penn Central* . . . ." However, Ward never alleged the restriction was only temporary. Ward consistently argued the restriction was permanent, though ultimately cut short, and therefore constituted a categorical taking.[9]

¶25.    Whether the permit "effected a categorical taking depends on if it left plaintiffs without any present or future interest in economically viable use in their parcel as a whole or only diminished the value of their interests." *Resource Inv.*, 85 Fed. Cl. at 484 (citing *Tahoe-Sierra,* 535 U.S. at 329-31). "To be sure, events after the taking has accrued . . . can certainly reduce the impact of the taking by cutting it short. . . . Yet, such subsequent events cannot change what property interests the taking took when it accrued." *Id.*

¶26.    From the point the permit took effect, it was intended to be permanent. Taking the facts in the light most favorable to Ward, when MHC pledged the property as wetlands mitigation and ACE issued the permit, Ward could no longer make economically viable use of the property. It could not develop it; it could not obtain permits for development; it could not sell it. MHC's taking it for wetlands mitigation became the property's only use. Specifically, when Ward presented a sketch plat to the City of Gulfport Planning

---

[9]Ward argued below and argues here that if not a categorical taking, MHC's actions constituted a partial regulatory taking, but that argument is an alternative one. Ward never abandoned its position that there was a categorical taking.

Commission, a representative of MHC appeared at a hearing on the matter and objected to the development based on MHC's use of the property as wetlands mitigation.

¶27.  Once a taking has occurred, just compensation is the only proper remedy. ***First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles***, 482 U.S. 304, 306-07, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987). A property owner is entitled to compensation for the period a regulation unconstitutionally takes the property interest in question until it is rescinded or repealed—or in other words, the effect of the taking is "cut short." *See **Resource Inv.***, 58 Fed. Cl. at 474 (citing ***First English***, 482 U.S. at 306-07). Where the government's actions have already worked a taking of all use of property, no subsequent action by the government—whether through amendment, withdrawal, or invalidation of the regulation—can relieve it of the duty to provide compensation for the period during which the taking was effective. ***First English***, 482 U.S. at 313-21.

¶28.  In sum, a genuine issue of material fact exists as to whether the permit was a permanent restriction cut short which left Ward without economically viable use of the property for the duration of the permit, and that genuine issue of disputed fact should have defeated summary judgment. Therefore, the trial judge erred by failing to note the distinction between the temporary moratoria at issue in ***Tahoe-Sierra*** and the permanent restriction cut short in ***Lucas*** and in failing to address Ward's argument that a categorical taking had occurred.

*B. The trial court erred in finding no partial regulatory taking took place.*

14

¶29. Under ***Penn Central***, the court must assess whether the regulation went "too far" by balancing (1) the "economic impact of the regulation on the claimant;" and (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" against (3) "the character of the governmental action." ***Penn Central***, 438 U.S. at 124.

¶30. Evidence in the record shows that Ward was deprived of all economically viable use of the property during the time the permit was in effect. Ward's designated expert appraiser was expected to testify that Ward had suffered damages for the three years during which the permit was in effect. The trial court made no findings on the admissibility or credibility of this witness, so the proposed testimony must be taken as true for summary judgment purposes.

¶31. The investment-backed expectations prong requires "an objective, but fact-specific inquiry into what, under all the circumstances, the [landowner] should have anticipated," in other words, whether the owner is able to use its property as it reasonably anticipated at the time the property was purchased. ***Cienega Gardens v. United States***, 331 F.3d 1319, 1346 (Fed. Cir. 2003). MHC argues that Ward cannot show a loss of investment-backed expectations because it failed to "produce numerous potential buyers or development plans."

¶32. However, Ward provided record affidavit evidence that, prior to issuance of the permit, Ward had (1) a pending wetlands permit with ACE concerning potential development of part of the property and (2) "significant negotiations with multiple potential buyers of portions of the property including William Carey College and Sembler Atlanta, Inc." Following issuance of the permit, "significant communication with potential purchasers"

15

other than MHC ceased. After issuance of the permit, Ward sought a water quality permit for development of the property, but it was denied. Mississippi Rule of Civil Procedure 56(c) provides that affidavits may present genuine issues of material fact sufficient to defeat a motion for summary judgment.

¶33.    MHC concedes that the government-character prong weighs heavily in favor of Ward because the permit forced Ward to shoulder a "disproportionate burden" of the wetlands mitigation property compared to others in the community.[10] Yet, it claims it was ACE's actions, rather than MHC's, that caused the disproportionate burden. MHC claims it was an innocent pawn, forced to pledge Ward's property as wetlands mitigation. However, Ward presented deposition testimony from an environmental scientist with the EPA who was present at the meeting with the EPA, MHC, and ACE that MHC was the entity which suggested using Ward's property as mitigation:

> Q. Who suggested what land to be used within the watershed?
> A. Based on my recollection that was [MHC] as the project proponent. That's their responsibility to suggest compensatory mitigation options.
> Q. Did [MHC] suggest which land to use?
> A. To the best of my recollection, they did.

The Chief of ACE's Regulatory Coastal Branch was also present at the meeting. When asked who suggested using Ward's land as mitigating, he responded "[MHC] provided us with their mitigation, revised mitigation plan[.]" Rule 56(c) provides that depositions may present genuine issues of material fact sufficient to defeat a motion for summary judgment.

_____

[10]Ward owned more than 1,200 of the 1,600 acres proposed for mitigation.

16

¶34. Taking the facts in the light most favorable to Ward, MHC's actions in applying for the permit and suggesting Ward's property be used as wetlands mitigation forced Ward to bear a disproportionate amount of deprivation of the mitigation acreage.

## CONCLUSION

¶35. We find the circuit court erred in granting the Mississippi State Highway Commission's motion for summary judgment for the following reasons:

1. Ward's claims are not barred by *res judicata* because the subject matter and/or cause of action of the federal case is different from the one in this case.

2. Ward's claims are not barred by collateral estoppel because the causation element of standing in the federal case concerned ACE's violations of federal law in issuing the permit, whereas the causation element of this action concerns MHC's action in suggesting Ward's property be used as mitigation.

3. The trial court erred in failing to address Ward's argument that a categorical taking took place in that the permit deprived Ward of all economically viable use of the property, even if the total deprivation was subsequently cut short due to the district court's invalidation of the permit.

4. Ward presented evidence in the form of affidavit and deposition testimony that MHC suggested using Ward's property as mitigation, the permit caused Ward's requested development plans to be denied and caused potential buyers to back out of negotiations, and Ward suffered damages in the period between the permit's issuance and invalidation. This evidence was sufficient to defeat summary judgment.

17

¶36. We reverse the judgment of the Harrison County Circuit Court and remand this case to the trial court for proceedings consistent with this opinion.

¶37.    **REVERSED AND REMANDED.**

    **WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**